## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| **JOHN A. PRICE**<br>**5630 Buccaneer Court**<br>**Churchton, Maryland 20751** | ) |
| | ) |
| | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| | ) |
| **v.** | ) |
| | ) |
| **BEN BERNANKE, CHAIRMAN,** | ) |
| **THE BOARD OF GOVERNORS OF** | ) |
| **THE FEDERAL RESERVE SYSTEM** | ) |
| | ) |
| **Defendant** | ) |
| | ) |
| **Serve:** | ) |
| | ) |
| **UNITED STATES ATTORNEY'S OFFICE** | ) |
| **FOR THE DISTRICT OF COLUMBIA** | ) Case No. _____ |
| **Attn:  Civil Process Clerk** | ) |
| **United States Attorney's Office** | ) |
| **555 4th Street, NW** | ) |
| **Washington, DC 20530** | ) |
| *-Via Certified Mail* | ) |
| | ) |
| **UNITED STATES ATTORNEY GENERAL** | ) |
| **10th & Pennsylvania Avenue, NW** | ) |
| **Washington, DC 20530** | ) |
| *-Via Certified Mail* | ) |
| | ) |
| **BEN BERNANKE** | ) |
| **20th and C Streets, NW** | ) |
| **Washington, D.C. 20551** | ) |
| *-Via Certified Mail* | ) |
| | ) |
| **THE BOARD OF GOVERNORS OF** | ) |
| **THE FEDERAL RESERVE SYSTEM** | ) |
| **20th and C Streets, NW** | ) |
| **Washington, D.C. 20551** | ) |
| *-Via Certified Mail* | ) |
| | ) |

---

## CIVIL COMPLAINT FOR EQUITABLE AND MONETARY RELIEF AND DEMAND FOR JURY

1.      This action arises out of the Defendant Board of Governors of the Federal Reserve System's unlawful employment actions against the Plaintiff John Price.  Specifically, Mr. Price alleges that the Board of Governors of the Federal Reserve System discriminated against him on the bases of race (white/Caucasian), sex (male), and age (D.O.B. April 24, 1952) in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e *et seq*., and the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 621 *et seq*., by underrating Plaintiff and by promoting less qualified minority, female, and younger employees as part of a systemic pattern and practice of disproportionately and disparately favoring minorities, females, and younger employees for hiring and promotion and for awarding remuneration and employment benefits within the Board, specifically in the Information Technology Division.  Further, by underrating Plaintiff and by promoting less qualified minority, female, and younger employees Defendant retaliated against Plaintiff for engaging in Equal Employment Opportunities activities in violation of Title VII and the ADEA.

### Parties

2.      Plaintiff John A. Price ("Mr. Price") is a 54 year old (D.O.B. April 24, 1952) white/Caucasian male resident of the City of Churchton, County of Anne Arundel, in the State of Maryland.

3.      Defendant Ben Bernanke is the Chairman of the Board of Governors of the Federal Reserve System and is the delegated administrator of the Board of Governors of the Federal Reserve System ("the Agency") and is responsible for the lawful administration of the

2

Agency. As such, Chairman Bernanke is the proper defendant in this action pursuant to 42 U.S.C. § 2000e-16.

## Jurisdiction

4.      This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as it asserts a claim that arises under the Constitution, laws, or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 621 *et seq.*

5.      This Honorable Court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e-5(F)(3), as it asserts a claim that arises under Title VII of the Civil Rights Act of 1964 and 29 U.S.C. § 633a.(c) as it asserts a claim that arises under the Age Discrimination in Employment Act of 1967.

## Venue

6.      Venue is proper in the District of Columbia under 29 U.S.C. § 1402 because a substantial part of the acts and omissions that give rise to this Complaint occurred in the Board of Governors of the Federal Reserve System's offices located at 20th and C Streets, NW, in Washington, D.C., and venue is proper under § 2000e-5(F)(3) because the Defendant has its principal office in the District of Columbia.

## Factual Allegations[1]

7.      Mr. Price is a Data Center and Distributed Software Support Manager, FR 29, at the Board's Information Technology Division, Security Systems and Data Center Branch, in Washington, D.C. since 1980.

8.      In or about 1996 or 1997, when Alice Rivlin was Vice Chair of the Board of Governors at the Agency, Vice Chair Rivlin noted that the Agency had low percentages of women and minorities in senior positions, and the Board responded by instituting several diverse formal and informal efforts to promote females and minorities to remedy the perceived discrepancy in the number of white males over the age of 40 versus females and minorities as officers at the Agency.[2]

9.      Thus beginning in the 1990s, the Board of Governors[3] of the Federal Reserve System issued an Agency-wide directive directing Agency directors and officers to try to hire and promote females and minorities to counter the Agency's image in the eyes of the Congress that it is dominated by white males.[4]

10.      Included in these efforts was an informal Agency-wide directive to promote females and minorities to remedy the perceived discrepancy in the number of white males over the age of 40 versus females and minorities as officers at the Agency.[5]

---

[1] On Friday, February 20, 2004, counsel for Mr. Price deposed Marianne Kay Emerson, Director of the Agency's IT Division, as its corporate representative. In this Complaint, Mr. Price refers the Court and the Agency to Ms. Emerson's deposition testimony in support of certain factual allegations, and the citations to Ms. Emerson's testimony are as follows, "Emerson Depo., p.___." Further, on Monday, April 26, 2004, counsel for Mr. Price deposed Stephen R. Malphrus, the Staff Director for Management at the Agency. In this Complaint, Mr. Price refers the Court and the Agency to Mr. Malphrus' deposition testimony in support of certain factual allegations, and the citations to Mr. Malphrus' testimony are as follows, "Malphrus Depo., p.___."
[2] Malphrus Depo., pp. 191-199.
[3] Emerson Depo., pp. 119-120.
[4] Emerson Depo., p. 94.
[5] Emerson Depo., p. 94.

11.     In an effort to hire and promote females and minorities, the Agency began transferring work assignments from white males over the age of 40, including Mr. Price, to similarly situated females and minorities in an effort to cause the benefited females and minorities to have greater access to opportunities for success and career development.

12.     The Agency also justified this hiring and promotion scheme by reorganizing work assignments so that better advancement opportunities and career development opportunities were shifted away from white males over the age of 40 to similarly situated females and minorities.

13.     The Agency transferred better advancement opportunities and career development opportunities from Mr. Price to Sue Marycz, a similarly situated but less tenured and skilled employee, in 1997 and 1998.

14.     Ms. Marycz was later promoted based on the work she was able to complete, and Mr. Price has remained at the same level.

15.     Marianne Emerson, the Director of the Agency's IT Division and Mr. Price's supervisor, subjectively implements this Agency-wide directive in the IT Division (where Mr. Price works) to attempt to promote females and minorities to increase or to remedy the discrepancy in the number of white males versus minorities as officers at the Agency as part of her employment as Division Director at the Agency.

16.     According to Ms. Emerson, if presented with a white male and a minority or a female candidate for a position, she would assess the candidates using five unwritten criteria and then subjectively would apply the Agency-wide directive in favor of minorities and females when and where she subjectively might believe it to be appropriate, "I would look at

if there were two individuals that were pretty comparable in those five categories, then I would give slightly greater weight to the one who was a minority."[6]

17.    A Division Director at the Agency like Emerson is free to attach whatever weight they care to in the promotion process to the implementation of these policies encouraging people to promote females and minorities over white males.[7]

18.    After 1995, Sheila Clark, the EEO officer at the Agency, also began encouraging division directors at the Agency to start thinking about promoting minorities and females who were already employed by the Agency at the Agency's reserve banks.[8]

19.    Ms. Clark encouraged management to develop and promote from informal "feeder pools" of minority and female candidates within the Agency and its reserve banks to increase or to remedy the apparent discrepancy in the number of white males versus minorities as officers at the Agency.[9]

20.    In a further effort to hire and promote females and minorities, the Agency began promoting females and minorities with less tenure, skill and experience than their similarly situated 40+ year old white males, including Mr. Price.

21.    The Agency justified this hiring and promotion scheme by manipulating Performance Management Policy (PMP) evaluation ratings for white males over the age of 40, and in implementing this Agency-wide directive the Agency introduced Performance Management Policy (PMP) rating quotas at the Agency.

---

[6] Emerson Depo., pp. 96-97.
[7] Emerson Depo., p. 100.
[8] Malphrus Depo., pp. 185-188.
[9] Malphrus Depo., p. 188.

6

22.     Ms. Emerson is familiar with PMP rating quotas at the Agency[10] and that she believes she has copies of documents reflecting these quotas in her office.[11]

23.     An Agency employee's PMP scores, as assigned by their supervisors, are important factors in determining who is promoted to officer level at the Agency.

24.     That there are written rules governing PMP scores in the Performance Management Policy and that these rules either directly or indirectly determine who is promoted to officer.[12]

25.     Tillena Clark, an African-American female, had, upon information and belief, lower PMP scores than Mr. Price, and she was younger, had less experience and skill in her position than did Mr. Price.

26.     However, despite the forgoing Ms. Clark, who was similarly situated to Mr. Price, was promoted to officer at the Agency and Mr. Price was not.

27.     According to Ms. Emerson, "I believe that Ms. Clark that her integrity was not particularly good, that she didn't take responsibility for her actions, that she was not a particularly competent manager, and that promoting her [was] a huge mistake."[13]

28.     According to Ms. Emerson, the Agency's Director of its IT Division improperly abused its discretion in 1999 by promoting Tillena Clark, a minority female, to an officer position.[14]

29.     After the Agency began justifying this hiring and promotion scheme by manipulating Performance Management Policy (PMP) evaluation ratings for white males over

---

[10] Emerson Depo., pp. 54-55.
[11] Emerson Depo., p. 155.
[12] Emerson Depo., p. 68.
[13] Emerson Depo., p. 34.
[14] Emerson Depo., pp. 34, 44-45.

the age of 40, Mr. Price's PMP evaluation ratings dropped from Outstanding to Commendable for the first time in his career.

30.    Prior to Ms. Emerson's appointment, Mr. Richard Stevens, while acting in the same capacity, implemented the same Agency-wide directive to attempt to promote females and minorities to increase or to remedy the discrepancy in the number of white males versus minorities as officers at the Agency as part of his employment as Division Director at the Agency from 1999 – 2002.

31.    Prior to Mr. Stevens' appointment, Steven Malphrus, while acting in the same capacity implemented the same Agency-wide directive to attempt to promote females and minorities to increase or to remedy the discrepancy in the number of white males versus minorities as officers at the Agency as part of his employment as Division Director at the Agency from 1992 – 1999.

32.    According to Ms. Emerson, there has been a program called "an upward mobility program," at the Agency where the end result was the promotion of females and minorities.

33.    It is Ms. Emerson's opinion that the upward mobility program "was more or less a disaster," and as the result of this program, Ms. Emerson currently has a number of minorities and females in professional positions that are not fully qualified for their positions.[15]

34.    Ms. Emerson is trying to reduce the number of under-qualified females and minorities in her division that have been promoted as the result of the upward mobility program.[16]

---

[15] Emerson Depo., pp. 141-142
[16] Emerson Depo., pp. 142-143.

8

35.     In response to being discriminated against by the Agency as a white male aged over 40 in favor of the Agency's actively and subjectively hiring, promoting and stripping choice assignments from white males aged over 40 and giving choice assignments to minorities and females so that they will have a superior opportunity and likelihood of being promoted within the Agency, Mr. Price sought EEO counseling and subsequently filed a formal class complaint (FRB-EEO-01-03-001) on March 15, 2001, alleging discrimination on the bases on the bases of race (white/Caucasian), sex (male), and age (D.O.B. April 24, 1952) in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 621 *et seq.*, when it engaged in a long-term systemic pattern and practice of disproportionately and disparately favoring females and minorities for hiring and promotion and for awarding remuneration and employment benefits.

36.     In his formal class complaint dated March 15, 2001, Price alleged that the Agency was actively discriminating against white males over the age of 40 by manipulating PMP rating quotas and reorganizing their jobs.

37.     Price specifically alleged that the February 6, 2001, announcement of the reorganization of the Division of Information Technology disparately impacted white males over the age of 40 by removing them from opportunities for success and career development.

38.     Price also alleged that the February 6, 2001, announcement of the reorganization of the Division of Information Technology also announced the promotion of two minority employees to the position of Assistant Director, and he noted that the promotion of these individuals took place despite the fact that they were promoted over equally or more qualified white male employees, including John Price who was aged 48 at the time.

39.     After Mr. Price sought EEO counseling and filed a formal class complaint (FRB-EEO-01-03-001), management at the Agency began to evaluate rigorously his performance on certain work projects, which was something that the management at the Agency had not done prior to the filing of his formal March 15, 2001, EEO complaint.

40.     After Mr. Price sought EEO counseling and filed a formal class complaint on March 15, 2001, management at the Agency did not grant his request for an Alternative Work Arrangement (AWA), which was something that the management at the Agency had not done prior to the filing of the March 15, 2001, EEO complaint when requested by other employees.

41.     After Mr. Price sought EEO counseling and filed a formal class complaint on March 15, 2001, Ms. Emerson began claiming that Mr. Price personally was accountable for delays in implementing the Mainframes System Rotation Program, which was something that the management at the Agency had not claimed prior to the filing of Mr. Price's formal March 15, 2001, EEO complaint.

42.     After Mr. Price sought EEO counseling and filed a formal class complaint on March 15, 2001, management at the Agency began questioning Mr. Price's decision to ask a subordinate to act on his behalf while he was away from his office on an AWA off-day, which was something that the management at the Agency had not done prior to the filing of the March 15, 2001, EEO complaint with regard to other employees.

43.     After Mr. Price sought EEO counseling and filed a formal class complaint on March 15, 2001, management at the Agency, including Ms. Emerson, began excluding Mr. Price from informal management meetings and refusing to talk with him, which was something that the management at the Agency had not done prior to the filing of Mr. Price's formal March 15, 2001, EEO complaint.

44.     After Mr. Price sought EEO counseling and filed a formal class complaint on March 15, 2001, management at the Agency increased the rate at which they transferred certain high visibility projects he was working on away from him and to his minority peers, which was something that the management at the Agency had not yet done with such speed and vigor prior to the filing of the March 15, 2001, EEO complaint.

45.     On or about May 7, 2001, Mr. Richard Stevens directed the IT Officer and Managers to target Hispanics for hiring and promotion, whereupon the coveted assignment of voice communications was transferred from Mr. Price to Raymond Romero, a similarly ranked Hispanic employee of the Agency with ten fewer years of relevant experience.

46.     Mr. Price sought EEO counseling and subsequently filed a second formal complaint (FRB-EEO-01-06-002) on June 22, 2001, alleging that he was harassed in reprisal for his prior EEO activity when the Agency's management subjected him to intimidation, abnormal monitoring of his performance, and transferred high visibility projects from him to his minority peers.

47.     On June 28, 2001, Sheila Clark, the EEO Programs Director of the Agency's Equal Employment Opportunities Programs Office sent Mr. Price a letter acknowledging receipt of formal complaint FRB-EEO-01-06-002 and acknowledging that it was related to Mr. Price's formal class complaint (FRB-EEO-01-03-001) that was filed on March 15, 2001.

48.     On July 27, 2002, Sheila Clark, the EEO Programs Director of the Agency's Equal Employment Opportunities Programs Office, sent Mr. Price a letter advising him of the accepted bases and issues for investigation.

11

49.    On April 19, 2002, a co-worker came to Mr. Price's office and informed Mr. Price that Senior IT Management had met to discuss Mr. Price's EEO case and how the Agency could "get rid" of him.

50.    Over the next two weeks, a number of Mr. Price's peers, colleagues, and co-workers came to Mr. Price's office and asked him to confirm this rumor.

51.    One non-manager employee said that they and some other employees were afraid to talk to Mr. Price out of fear of retaliation.

52.    This individual told Mr. Price that the individual wanted no further contact, including telephone calls or emails, with Mr. Price unless they met outside the Agency's facilities.

53.    On May 3, 2002, a peer manager came to Mr. Price's office and stated that there were investigations into Mr. Price's alleged use of his office to "run a restaurant," and this was going to be used as a reason for termination.

54.    On or about March 5, 2002, Mr. Richard Stevens, the IT Divisions Director informed Mr. Price that Raymond Romero, a similarly ranked Hispanic employee of the Agency with fewer skills and ten fewer years of relevant experience, was selected in lieu of the Mr. Price for the position of IT Assistant Director, Security Systems and Data Center Branch, in Washington, D.C.

55.    In response, Mr. Price sought EEO counseling and subsequently filed a third formal complaint (FRB-EEO-02-05-003) on May 10, 2002, alleging that the Agency engaged in a long term systemic pattern and practice of discriminating against him on the basis of sex, race, and age by under-rating his performance, reassigning important projects and reducing

12

the scope of his responsibilities, which resulted in the loss of advancement opportunities and other benefits that were due to him.

56.    In his May 10, 2002, formal complaint (FRB-EEO-02-05-003), Mr. Price also alleged race discrimination in his non-selection in promoting Raymond Romero, a less qualified Hispanic employee, to the position of IT Assistant Director, Security Systems and Data Center Branch, in Washington, D.C.

57.    In his May 10, 2001, formal complaint, Mr. Price also alleged that management disproportionately and disparately favored females and minorities for hiring and promotion and for awarding remuneration and employment benefits.

58.    In his May 10, 2001, formal complaint, Mr. Price also alleged that management individuals had isolated him from his peers, avoided meeting, coordinating and including Mr. Price in day-to-day operational issues, had withheld information critical to the successful completion of his work assignments, and transferred high visibility projects from him to his minority peers.

59.    Mr. Price also reported that management had begun subjecting him to abnormal monitoring by high level management (including Ms. Emerson), and that these individuals had prejudicially evaluated his performance as unsatisfactory in order to justify management's previous actions leading up to his March 15, 2001, formal complaint of discrimination.

60.    Mr. Price also complained that Ms. Emerson was retaliating against him because he had specifically listed her in his March 15, 2001, formal complaint.

61.    On May 23, 2002, Sheila Clark, the EEO Programs Director of the Agency's Equal Employment Opportunities Programs Office sent Mr. Price a letter acknowledging

13

receipt of formal complaint FRB-EEO-02-05-003 and acknowledging that it was related to

Mr. Price's formal class complaint (FRB-EEO-01-03-001) that was filed on March 15, 2001.

62.    On May 31, 2002, a subordinate employee asked Mr. Price if he had filed a

lawsuit against the Agency, and he informed Mr. Price that there were rumors circulating

within the Agency about Mr. Price's multiple complaints.

63.    The subordinate employee also expressed concern that the Agency's Senior IT

management might retaliate against Mr. Price and was upset that the retaliation might directly

or indirectly impact the subordinate members of the work group under Mr. Price's

supervision.

64.    Moreover, this subordinate employee was worried that the Agency's Senior IT

management would abolish Mr. Price's work unit as a way to get rid of Mr. Price, and the

subordinate employee added that at least three other members of Mr. Price's work unit were

aware of the rumor and shared the subordinate employee's concern.

65.    On August 19, 2002, Sheila Clark, the EEO Programs Director of the Agency's

Equal Employment Opportunities Programs Office, sent Mr. Price advising him of the

accepted bases and issues for investigation.

66.    More recently, on January 29, 2004, Ms. Emerson, shortly after being deposed

in Mr. Price's EEO action, informed Mr. Price that, in addition to his regular duties, due to an

"IT division reorganization" he was going to have to assume the work of another full time

employee.

67.    At this point Ms. Emerson and the Agency essentially set Mr. Price up to fail

by assigning him to handle two existing management units with no increase in resources or

any other means to successfully carry out the duties previously performed by two mangers.

68.     Within a six-month period, despite the obstacles presented by this reorganization, Mr. Price transformed the unit into a fully functioning, efficiently managed, and ultimately prolific entity.

69.     During this time, because of Mr. Price's success with his new duties, Emerson acknowledged his triumph in an e-mail that she sent to him on December 14, 2005.

70.     Mr. Price filed his fourth EEO complaint of retaliation (FRB-EEO 060-1-002) on March 10, 2004, and the EEO counselor accepted the complaint with the initial date of discrimination set at January 28, 2003.

71.     The Administrative and judicial handling of Mr. Price's EEO complaints have been continuing in nature, and the Board has been deposed as part of the EEO processing. Moreover, Mr. Price currently has a federal case alleging discrimination against the Board on appeal before the Circuit Court of Appeals for the District of Columbia Circuit, and upon information and belief the Board, as well as Mr. Price's supervisors Po Kim, Maureen Hannan, and Marianne Emerson, are aware of the pendency of this federal appeal.

72.     For the last two years, Po Kim has been Mr. Price's first-line supervisor, and for the last three years, Maureen Hannan has been Price's second-line supervisor.  Marianne Emerson continues to supervise Mr. Price.

73.     On or about October 31, 2005, Jill Rosen ("Rosen") was selected instead of Price for the position of Assistant Director, Division of Information Technology ("IT").

74.     Rosen was selected for an Officer position with the Board despite the fact that Rosen has less experience, has inferior qualifications and has made less significant achievements compared to Mr. Price.

75.     The Board engaged in a systemic pattern and practice of disproportionately and disparately favoring females for hire and promotion when it promoted Rosen and did not promote Mr. Price.

76.     By promoting Rosen, and by denying Mr. Price the opportunity for advancement, the Board retaliated against him for participating in protected activity and discriminated against him based on sex.

77.     The Board has a Special Achievement Awards program designed to recognize and reward employees who have made extraordinary accomplishments related to the mission and objectives of the Board.

78.     Mr. Price and Fred Vu ("Vu"), an Asian male under 40 years of age, were both nominated for the Special Achievement Award.

79.     Vu has less experience, inferior qualifications and less significant achievements than Mr. Price.

80.     Specifically, Mr. Price had been recently lauded for the superhuman efforts he demonstrated in his success under the reorganization described above in paragraphs 66 – 69.

81.     Moreover, in 2005, Mr. Price restructured the Board's Data Center operations and Distributed Software Support ("DSS") unit into a modern IT Help Desk service based organization with limited additional resources.

82.     As the word spread of the success of his IT Help Desk innovations, Mr. Price was approached by other entities within Board and asked to consider taking over their help desk support.  The end result was that Mr. Price negotiated and implemented a pilot agreement with another unit to assume help desk support for an additional 235 clients along

with the performance of other key responsibilities without an increase in human capital or other resources

83.    On December 8, 2005, the Board selected Vu instead of Price to receive its Special Achievement Award because of Mr. Price's race, age, and in retaliation for his prior EEO and district court activity.

84.    Despite the achievements outlined above, for the October 2004 – September 2005 rating period, Mr. Price was not rated "Extraordinary" in his annual performance evaluation.

85.    Peter Both ("Both"), a white male under forty years of age, was rated "Extraordinary" in his October 2005 PMP.

86.    Both has less experience, inferior qualifications and has less significant achievements than Mr. Price.

87.    Mr. Price was not rated "Extraordinary" due to his age and in retaliation for his prior EEO and district court activity.

88.    On January 9, 2006, Mr. Price filed a formal EEO complaint (FRB-EEO-060-1-002) claiming discrimination on the basis of sex, age, race, and retaliation due to his prior EEO activity.

89.    In his January 9, 2006, formal complaint Mr. Price claimed that due to sex discrimination and in retaliation for his prior EEO complaints, he was not promoted to the position of Assistant Director in the Division of IT and instead Rosen, a female was selected by the Board for this position.

90.    Also in his January 9, 2006, formal complaint Mr. Price claimed that due to his race, age, and in retaliation for his prior EEO complaints, he was not selected by the Board to

receive the Special Achievement Award on December 8, 2005, and instead the Board selected Vu to receive this award.

91.    Also in his January 9, 2006, formal complaint Mr. Price claimed that due to his age and in retaliation for his prior EEO activity, the Board did not rate him "Extraordinary" on his October 2005 annual performance evaluation, when it rated Both "Extraordinary" on his October 2005 annual PMP.

92.    Mr. Price is still employed by the Agency, but threats, intimidation, overwork and oppressive activities at the Agency have caused Mr. Price severe emotional and psychological distress.

93.    The Agency's actions caused Mr. Price's friends, peers, colleagues, and co-workers to question his abilities and integrity, and it tarnished his reputation and standing at the Agency.

94.    The Agency's actions also caused Mr. Price's staff to lose respect for him, thereby undermining his authority and impacting his ability to do his job.

95.    Mr. Price has, as the direct and proximate result of the Agency's illegal discrimination and reprisal on the basis of race, sex and age, been caused to suffer mental anguish, depression, anxiety, sleeplessness, increased stress, problems in his personal relationships and concern for his family's welfare.

96.    Mr. Price has, as the direct and proximate result of the Agency's illegal discrimination and reprisal on the basis of race, sex and age, been caused to suffer damages to his career and professional reputation, and the Agency's illegal discrimination on the basis of race, sex and age, is the direct and proximate cause of his not being promoted and sustained substantial economic losses.

**Count I**
**Title VII of the Civil Rights Act of 1964 (Title VII)**
**42 U.S.C. § 2000e *et seq*.**
**Discrimination**

97.    Plaintiff incorporates the allegations in paragraphs 1 through 96 as though alleged herein.

98.    Plaintiff is a "person" and an "employee" as the terms are defined at 42 U.S.C. 2000e and the Defendant Board of Governors of the Federal Reserve System is an "executive agency" as the term is defined at 42 U.S.C. 2000e-16.(a).

99.    Defendant failed and/or refused to hire Plaintiff for new positions, and otherwise discriminated against the Plaintiff with respect to his compensation, terms, conditions, or privileges of employment, because of Plaintiff's race, color, and/or sex.

100.    Defendant limited, segregated, and/or classified the Plaintiff in a way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of Plaintiff's race, color, and/or sex.

101.    Defendant engaged in an unlawful employment practice when it employed race, color, and/or sex as a motivating factor for its employment practices.

102.    Plaintiff sustained substantial monetary and non-monetary damages as the result of the Defendant's illegal conduct.

103.    Plaintiff demands such legal or equitable relief as will effectuate the purposes of 42 U.S.C. § 2000e *et seq.*, including, but not limited to, the following:

    a.    upgrading of Plaintiff, with or without back pay;
    b.    economic damages including front and back pay;
    c.    compensatory damages;
    d.    punitive damages;
    e.    reasonable attorney's fees;

19

f.   court costs; and any other relief that this Court deems just and equitable.

## Count II
### Age Discrimination in Employment Act of 1967 (ADEA)
### 29 U.S.C. § 621 *et seq.*
### Discrimination

104.   Plaintiff incorporates the allegations in paragraphs 1 through 103 as though alleged herein.

105.   Plaintiff is a "person" and an "employee" as the terms are defined at 29 U.S.C. § 621 and the Defendant Board of Governors of the Federal Reserve System is a "federal agency affected" as the term is defined at 29 U.S.C. § 633a.(a).

106.   Defendant has limited, segregated, and classified the Plaintiff in a way which deprives him of employment opportunities and otherwise adversely affect his status as an employee because of Plaintiff's age.

107.   Plaintiff sustained substantial monetary and non-monetary damages as the result of the Defendant's illegal conduct.

108.   Plaintiff demands such legal or equitable relief as will effectuate the purposes of 29 U.S.C. § 621 *et seq.*, including, but not limited to, the following:

a.   upgrading of Plaintiff, with or without back pay;
b.   economic damages including front and back pay;
c.   compensatory damages;
d.   punitive damages;
e.   reasonable attorney's fees;
f.   court costs; and any other relief that this Court deems just and equitable.

**Count III**
**Title VII of the Civil Rights Act of 1964 (Title VII)**
**42 U.S.C. § 2000e *et seq.***
**Retaliation/Reprisal**

109.    Plaintiff incorporates the allegations in paragraphs 1 through 108 as though alleged herein.

110.    Plaintiff is a "person" and an "employee" as the terms are defined at 42 U.S.C. 2000e and the Defendant Board of Governors of the Federal Reserve System is an "executive agency" as the term is defined at 42 U.S.C. 2000e-16.(a).

111.    Defendant engaged in reprisal against and retaliated against the Plaintiff because he opposed Defendant's discriminatory hiring and promotion practices and because he has made a charge, testified, assisted, and/or participated in any manner in an investigation, proceeding, and/or hearing under 42 U.S.C. § 2000e *et seq.*

112.    Plaintiff sustained substantial monetary and non-monetary damages as the result of the Defendant's illegal conduct.

113.    Plaintiff demands such legal or equitable relief as will effectuate the purposes of 42 U.S.C. § 2000e *et seq.*, including, but not limited to, the following:

        a.     upgrading of Plaintiff, with or without back pay;
        b.     economic damages including front and back pay;
        c.     compensatory damages;
        d.     punitive damages;
        e.     reasonable attorney's fees;
        f.     court costs; and any other relief that this Court deems just and equitable.

## Count IV
## Age Discrimination in Employment Act of 1967 (ADEA)
## 29 U.S.C. § 621 *et seq.*
## Retaliation/Reprisal

114.    Plaintiff incorporates the allegations in paragraphs 1 through 113 as though alleged herein.

115.    Plaintiff is a "person" and an "employee" as the terms are defined at 29 U.S.C. § 621 and the Defendant Board of Governors of the Federal Reserve System is a "federal agency affected" as the term is defined at 29 U.S.C. § 633a.(a).

116.    Defendant engaged in reprisal against and retaliated against the Plaintiff because Plaintiff opposed Defendant's discriminatory acts and because Plaintiff made a charge, testified, assisted, and participated in an investigation, proceeding, and litigation under 29 U.S.C. § 621 *et seq.*

117.    Plaintiff sustained substantial monetary and non-monetary damages as the result of the Defendant's illegal conduct.

118.    Plaintiff demands such legal or equitable relief as will effectuate the purposes of 29 U.S.C. § 621 *et seq.*, including, but not limited to, the following:

      a.  upgrading of Plaintiff, with or without back pay;
      b.  economic damages including front and back pay;
      c.  compensatory damages;
      d.  punitive damages;
      e.  reasonable attorney's fees;
      f.  court costs; and any other relief that this Court deems just and equitable.

## Prayer for Relief

WHEREFORE, Plaintiff Price prays this Honorable Court for Judgment against the

Defendant, in the amount of economic damages, compensatory damages, and punitive

damages to be determined at trial, plus attorneys' fees, costs of this action, equitable relief

(including upgrading Plaintiff's employment status and awarding front and back pay) and any

other relief this Honorable Court deems just and proper to award.

Respectfully Submitted,
John A. Price,
*By Counsel*

R. Scott Oswald, D.C. Bar No. 458859
Nicholas Woodfield, D.C. Bar No. 471801
Employment Law Group, PC
888 17th Street, N.W.
Suite 900
Washington, D.C. 20006-3307
(202) 261-2812
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.net
nwoodfield@employmentlawgroup.net
*Counsel for Plaintiff*

## Jury Demand

Plaintiff Price demands a jury for all issues proper to be so tried.

R. Scott Oswald
Nicholas Woodfield

23