# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT - E

COMPLAINANT'S AFFIDAVIT
Case Number FRB-EEO-06-01-002

I, John Andrew Price am an employee of the Board of Governors of the Federal Reserve System in its Office of the Staff Director for Management, Information Technology Division, Security Systems and Data Center Branch, in Washington, D.C.

I am and have been employed as a Mainframe Systems Manager, FR-28, at the Board's Information Technology Division, Security Systems and Data Center Branch, in Washington, D.C. since 1980.

My telephone number during working hours is (202) 452-2559.

**I HAVE BEEN ADVISED OF THE FOLLOWING: I have an obligation to cooperate fully with the investigator, who has been assigned to conduct a thorough and impartial investigation of my complaint of discrimination. Therefore, I must provide a statement for the investigative record which is true and complete to the best of my knowledge and belief and which fully addresses the issues accepted for investigation. My statement must be specific with regard to names, dates, places, circumstances and related events, and disclose my firsthand knowledge of any directly related information which is relevant to the issues(s).**

**My statement, along with my Informal Complaint, Counselor's Summary Report, my Formal Complaint, and the description of the issues(s) for investigation shall serve as the basis for the investigation. While I may voluntarily submit any additional documents or information to the investigator for consideration, it will be the investigator's responsibility to determine what evidence shall actually become part of the investigative report. If there are any documents or facts, which substantiate my allegations, I must provide them to the investigator, or make them known to the investigator. I may suggest witnesses to be interviewed by the investigator. However, the investigator will decide which witnesses to interview based on relevant information he or she feels will be furnished.**

**My statement is made under oath (or affirmation), without a pledge of confidentiality, in accordance with the rules, regulations, policies, and procedures of the Equal Employment Opportunity Commission and the Board of Governors of the Federal Reserve System. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of this statement and be given an opportunity to respond. Agency officials responsible for processing complaints of discrimination will have access to the entire investigative report. If discrimination is found, any employee accused of discrimination will have an opportunity to review a sanitized version of the report. If discrimination is found and disciplinary action is proposed, the employee accused of discrimination will have an opportunity to review the report in its entirety without deletions. Participants in the discrimination complaint process are specifically protected by law and the EEO regulations from any acts of reprisal, discrimination, coercion, harassment, restraint, or interference for their participation in the investigation and other phrases of complaint processing.**

000036

Initial

Page 1 of 14 – Affidavit of John Andrew Price

RO100084

**I have the right to be represented by a person of my choice during the presentation of my complaint and preparation of my statement (so long as my choice does not result in a conflict of interest). I have chosen a personal representative at this stage of my complaint, and I have advised the investigator and the EEO Programs Director in writing of my selection.**

**I have the right to review my statement prior to signing it, and may make initialed corrections if it is incomplete or inaccurate. I have a right to receive a copy of the signed statement.**

I.   **DISCRIMINATION BASED ON SEX AND RETALIATION (NON PROMOTION).**

My current first-line supervisor is Mr. Po Kim. My current second-line supervisor is Maureen Hannan.

There is no process used to notify potential candidates of vacant officer positions within the IT Division. The Marianne Emerson (Female) (Prior EEO) who is the Director of the FRB's IT Division, does not post or compete officer promotions which is the practice of the Board. The decision as to who might be selected and put forth as a candidate for promotion is based on a set of five unwritten criteria that are subjectively applied by Ms. Emerson, my Division Director. She is free to consult with, or not consult with, other officers when making her decision, but she does not have to inform potential candidates whether they are being considered or why they would not be considered. This is the case for the selection for the position of Assistant Director, Division of IT, NIC Systems Position (officer).

As explained above, the Director of the FRB's IT Division does not post job announcements or other requests for applicants for officer promotions. When an officer position is open or vacant, the Ms. Emerson nor the FRB provide potential candidates notice of the vacancy or opportunity to apply for Officer positions so that they can be competitively considered for a promotion to officer level. Therefore, I was not provided the opportunity to compete and apply for the subject open position. I was not interviewed for the subject position. Therefore, I have not information on whether interviews were conducted or who conducted the interviews.

On June 14, 2004, I removed my then pending EEO complaints to federal district court in Washington, D.C., and on September 29, 2004, before the Court had the opportunity to issue a scheduling order, permitting me to obtain discovery, the Board filed a Motion to Dismiss, or in the Alternative, for Summary Judgment. On June 22, 2005, the District Court granted the Board's Motion to Dismiss, or in the Alternative, for Summary Judgment and denied my Motion to Stay Consideration of the Board's Motion for Summary Judgment and to Permit Discovery, Pursuant To Rule 56(f). On July 8, 2005, I filed a Rule 59(e) Motion for Reconsideration and Motion to Amend or Alter Judgment, but on August 23, 2005, the District Court denied the motion. On October 31, 2005, Ms. Emerson and the Board promoted Jill Rosen, a female with less experience, inferior qualifications and less significant achievements, to the officer level position of Assistant Director. I believe that the Board promoted a female with less experience, inferior qualifications and less significant achievements than me, to an officer level position of

000037                               Initial

Page 2 of 14 – Affidavit of John Andrew Price

ROI00085

Assistant Director instead of me because the District Court had recently dismissed my EEO case and the Board felt free to act after the case had been dismissed. I also believe that Ms. Emerson was acting in accordance with all of the discriminatory policies set forth above because she testified that this is the standard operating procedure at the Board.

This year marks my 25th anniversary as a Board employee. In all, my career in Information Technology has spanned 36 years. In 1975, I graduated from American University with a Bachelor of Science degree in Technology of Management. Prior to joining the Board, I worked as an Assembler Language programmer working for the old Atomic Energy Commission, Library of Congress, National Institutes of Health, National Geographic Society, and various defense contractors. In 1980, I was hired by the Board as a Systems Programmer assigned to support Bulk Data and BOPEAP.

Within a few years of joining the Systems Programming Section, I was assigned to install the first network communication system at the Board. I had the great privilege to be the first Communication Analyst at the Board and be assigned the technical responsibility for installing, testing and implementing the Systems Network Architecture (SNA) backbone network that interconnected all the mainframes in the Federal Reserve System. This was quite a feat twenty-three years ago and stands as my most memorable technical achievement.

A few years later I was offered the position of Section Chief of Telecommunications, which I accepted. For the next few years my section architected and implemented the Board's first fiber-optic backbone network, oversaw the introduction of distributed network computing, introduced the Internet to the casual user, built and supported the first electronic mail services, supported critical client distributed applications like ASAP and Records, and established the model for advanced networking infrastructure. A few years later, the Division underwent the first significant reorganization of my career. IRM was created and the organization was flattened eliminating multiple levels of management and replacing the Section Chief positions with smaller Unit Manager positions. I was assigned to manage the Enterprise Network unit and continued to lead the advancement of enterprise networking. I held this position for the next few years before being assigned to manage the Mainframe Systems unit.

In my twenty-five years at the Board, I have been involved in some of the most critical and technologically complex automation projects. My technical and managerial accomplishments include advanced mainframe and distributed disaster recovery planning, network engineering, Help Desk services, procurement and implementation of the critical applications services like the FRS live scan fingerprint system and Y2K Iridium Satellite Phone System. In all, my career in Information Technology has spanned thirty-six years.

In 1996 or 1997, when Alice Rivlin was Vice Chair of the Board of Governors at the Federal Reserve Board, Vice Chair Rivlin noted that the Board had low percentages of women and minorities in senior positions, and the Board responded by instituting several diverse formal and informal efforts to promote females and minorities to remedy the perceived discrepancy in the number of white males over the age of 40 versus females and minorities as officers at the Board.[1]

---

[1] Malphrus Depo., pp. 191-199.

Page 3 of 14 – Affidavit of John Andrew Price

000038

Initial

RO100086

Thus beginning in the 1990s, the Board of Governors[2] of the Federal Reserve System issued an Agency-wide directive directing Agency directors and officers to try to hire and promote females and minorities to counter the Board's image in the eyes of the Congress that it is dominated by white males.[3]

After 1995, Sheila Clark, the EEO officer at the Board, also began encouraging division directors at the Board to start thinking about promoting minorities and females who were already employed by the Board at the Board's reserve banks.[4] Ms. Clark encouraged management to develop and promote from informal "feeder pools" of minority and female candidates within the Board and its reserve banks to increase or to remedy the apparent discrepancy in the number of white males versus minorities as officers at the Board.[5] Included in these efforts was an informal Agency-wide directive to promote females and minorities to remedy the perceived discrepancy in the number of white males over the age of 40 versus females and minorities as officers at the Board.[6] In an effort to hire and promote females and minorities, the Board began transferring work assignments from white males over the age of 40, including me, to similarly situated females and minorities in an effort to cause the benefited females and minorities to have greater access to opportunities for success and career development.

For example, Marianne Emerson, my supervisor and the Director of the Board's IT Division, subjectively implements this Agency-wide directive in the IT Division (where I work) to attempt to promote females and minorities to increase or to remedy the discrepancy in the number of white males versus minorities as officers at the Board as part of her employment as Division Director at the Board. According to Ms. Emerson, if presented with a white male and a minority or a female candidate for a position, she would assess the candidates using five unwritten criteria and then subjectively would apply the Board-wide directive in favor of minorities and females when and where she subjectively might believe it to be appropriate, "I would look at if there were two individuals that were pretty comparable in those five categories, then I would give slightly greater weight to the one who was a minority."[7] At the FRB a Division Director at the Board like Emerson is free to attach whatever weight they care to in the promotion process to the implementation of these policies encouraging people to promote females and minorities over white males.[8]

From May of 1999 to the present date Ms. Emerson has been involved in promotion recommendations for officer positions at the FRB. According to Ms. Emerson the Division of Information Technology has no written criteria that are utilized by the Board in determining who might be eligible for a promotion to officer.[9] Moreover, when questioned what unwritten criteria are utilized by the Board in determining who might be eligible for a promotion to officer she opined that the only criteria are:

---

[2] Emerson Depo., pp. 119-120.
[3] Emerson Depo., p. 94.
[4] Malphrus Depo., pp. 185-188.
[5] Malphrus Depo., p. 188.
[6] Emerson Depo., p. 94.
[7] Emerson Depo., pp. 96-97.
[8] Emerson Depo., p. 100.
[9] Emerson Depo., pp. 18-22.

000039

Initial

Page 4 of 14 – Affidavit of John Andrew Price

ROI00087

> 19:11   A.  First of all, it's important that the
> 12  person have very high integrity, that they be
> 13  honest, that they be customer service oriented.
> 14  Then there are experience requirements or
> 15  expectations and I would say in general, the
> 16  people who would be eligible -- and let me back
> 17  up. In Information Technology, all of our
> 18  assistant directors are managers. In some of the
> 19  other divisions, they have officers who don't
> 20  manage anybody. They just have, you know, their
> 21  official positions.
> 20:1   Q.  All right. Go ahead.
> 2   A.  But our people are managers, so it's
> 3  important that you be a good manager. So, in
> 4  general, to be eligible to be an officer, you
> 5  need to be one of the managers in our division.
> 6   Q.  Let me ask you this. You've listed
> 7  five criteria. Are these criteria written down?
> 8  anywhere?
> 9   A.  No.

Ms. Emerson utilizes these amorphous criteria to make a subjective determination as to whom she will recommendation for promotion to officer to Mr. Steven Malphrus, the staff director for management, and then to the full Board. In making her decision as to who might be recommended for promotion, Ms. Emerson may consult with other officers in the Division but it is not required that the director of the division consult with any of the other people before making or not making any recommendation. [10]

In a further effort to hire and promote females and minorities, the Board began promoting females and minorities with less tenure, skill and experience than their similarly situated 40+ year old white males, including me. The Board justified this hiring and promotion scheme by manipulating Performance Management Policy (PMP) evaluation ratings for white males over the age of 40, and in implementing this Agency-wide directive the Board introduced Performance Management Policy (PMP) rating quotas at the Board.

Ms. Emerson is familiar with PMP rating quotas at the Board,[11] and she believes she has copies of documents reflecting these quotas in her office.[12] An Agency employee's PMP scores, as assigned by their supervisors, are important factors in determining who is promoted to officer level at the Board. That there are written rules governing PMP scores in the Performance Management Policy and that these rules either directly or indirectly determine who is promoted to officer.[13] According to Ms. Emerson, the then Agency's Director of its IT Division improperly abused its discretion in 1999 by promoting Tillena Clark, a minority female, to an

---

[10] Emerson Depo., pp. 21-22.
[11] Emerson Depo., pp. 54-55.
[12] Emerson Depo., p. 155.
[13] Emerson Depo., p. 68.

000040

Initial

Page 5 of 14 – Affidavit of John Andrew Price

ROI00088

officer position.[14] Ms. Clark, an African-American female, had lower PMP scores than I did, and she was younger, had less experience and skill in her position than I was. However, despite the forgoing Ms. Clark, who was similarly situated to me, was promoted to officer at the Board and I was not. According to Ms. Emerson, "I believe that Ms. Clark that her integrity was not particularly good, that she didn't take responsibility for her actions, that she was not a particularly competent manager, and that promoting her [was] a huge mistake."[15]

Prior to Ms. Emerson's appointment, Mr. Richard Stevens, while acting in the same capacity, implemented the same Agency-wide directive to attempt to promote females and minorities to increase or to remedy the discrepancy in the number of white males versus minorities as officers at the Board as part of his employment as Division Director at the Board from 1999 – 2002. Prior to Mr. Stevens' appointment, Steven Malphrus, while acting in the same capacity implemented the same Agency-wide directive to attempt to promote females and minorities to increase or to remedy the discrepancy in the number of white males versus minorities as officers at the Board as part of his employment as Division Director at the Board from 1992 – 1999. According to Ms. Emerson, there has been a program called "an upward mobility program," at the Board where the end result was the promotion of females and minorities. It is Ms. Emerson's opinion that the upward mobility program "was more or less a disaster," and as the result of this program, Ms. Emerson currently has a number of minorities and females in professional positions that are not fully qualified for their positions.[16] Accordingly, Ms. Emerson is still trying to reduce the number of under-qualified females and minorities in her division that have been promoted as the result of the upward mobility program.[17]

In response to being discriminated against by the Board as a white male aged over 40 in favor of the Board's actively and subjectively hiring, promoting and stripping choice assignments from white males aged over 40 and giving choice assignments to minorities and females so that they will have a superior opportunity and likelihood of being promoted within the Board, I sought EEO counseling and subsequently filed a formal class complaint on March 15, 2001, alleging discrimination on the bases on the bases of race (white/Caucasian), sex (male), and age (D.O.B. April 24, 1952) in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 621 et seq., when it engaged in a long-term systemic pattern and practice of disproportionately and disparately favoring females and minorities for hiring and promotion and for awarding remuneration and employment benefits.

Management at the FRB began to evaluate rigorously my performance on certain work projects after I sought EEO counseling and filed a formal class complaint, and management then denied my request for an Alternative Work Arrangement (AWA). In fact, after I sought EEO counseling and filed my formal class complaint, Ms. Emerson began claiming that I personally was accountable for delays in implementing the Mainframes System Rotation Program, which was something that the management at the FRB had not claimed prior to the filing of my formal March 15, 2001, EEO complaint. Then, on or about May 7, 2001, Mr. Richard Stevens directed

---

[14] Emerson Depo., pp. 34, 44-45.
[15] Emerson Depo., p. 34.
[16] Emerson Depo., pp. 141-142
[17] Emerson Depo., pp. 142-143.

000041    Initial

Page 6 of 14 – Affidavit of John Andrew Price

the IT Officer and Managers to target Hispanics for hiring and promotion, whereupon the coveted assignment of voice communications was transferred from me to Raymond Romero, a similarly ranked Hispanic employee of the Board with ten fewer years of relevant experience. I sought EEO counseling and subsequently filed a second formal complaint on June 22, 2001, alleging that I was harassed in reprisal for my prior EEO activity when the Board's management subjected me to intimidation, abnormal monitoring of my performance, and transferred high visibility projects from me to my minority peers.

On April 19, 2002, a co-worker came to my office and informed me that Senior IT Management had met to discuss my EEO case and how the Board could "get rid" of him. Over the next two weeks, a number of my peers, colleagues, and co-workers came to my office and asked me to confirm this rumor. One non-manager employee said that they and some other employees were afraid to talk to me out of fear of retaliation. This individual told me that the individual wanted no further contact, including telephone calls or emails, with me unless they met outside the Board's facilities. On May 3, 2002, a peer manager came to my office and stated that there were investigations into my alleged use of my office to "run a restaurant," and this was going to be used as a reason for my termination.

On or about March 5, 2002, Mr. Richard Stevens, the IT Divisions Director informed me that Raymond Romero was selected in lieu of me for the position of IT Assistant Director, Security Systems and Data Center Branch, in Washington, D.C. In response, I again sought EEO counseling and subsequently filed a third formal complaint on May 10, 2002, alleging that the Board engaged in a long term systemic pattern and practice of discriminating against me on the basis of sex, race, and age by under-rating my performance, reassigning important projects and reducing the scope of my responsibilities, which resulted in the loss of advancement opportunities and other benefits that were due to me.

On May 31, 2002, a subordinate employee asked me if I had filed a lawsuit against the Board, and he informed me that there were rumors circulating within the Board about my multiple complaints. The subordinate employee also expressed concern that the Board's Senior IT management might retaliate against me and was upset that the retaliation might directly or indirectly impact the subordinate members of the work group under my supervision. Moreover, this subordinate employee was worried that the Board's Senior IT management would abolish my work unit as a way to get rid of me, and the subordinate employee added that at least three other members of my work unit were aware of the rumor and shared the subordinate employee's concern.

## II. DISCRIMINATION BASED ON RACE, AGE AND RETALIATION (NON SELECTION TO RECEIVE THE SPECIAL ACHIEVEMENT AWARD).

The Director, Marianne Emerson (Caucasian) (58) (Prior EEO) of the FRB's IT Division and/or other officers at the FRB, does not inform candidates of whether they are nominated for any award(s), nor do the Director of the FRB's IT Division and/or other officers at the FRB ever reveal the methods of nomination or consideration employed when making an award. Rather, they just announce award winners. Therefore, I have no knowledge of whether I was nominated for the December 8, 2005, award.

I have never received the Board's Special Achievement award. The Director of the FRB's IT Division and/or other officers at the FRB do not inform candidates of whether they are nominated for any award(s), nor do the Director of the FRB's IT Division and/or other officers at the FRB ever reveal the methods of nomination or consideration employed when making an award. Rather, they just announce award winners after the decision is made.

The responsibility for nominating an employee for the Board's special Achievement award is the employee's first-line supervisor. In my case, I believe it would be Po Kim, my immediate supervisor, would first nominate me for the award. However, the Director of the FRB's IT Division and/or other officers at the FRB do not inform candidates of whether they are nominated for any award(s), nor do the Director of the FRB's IT Division and/or other officers at the FRB ever reveal the methods of nomination or consideration employed when making an award. Rather, they just announce award winners after the decision is made.

I am not certain who would be re responsible for making selections of awardees for the subject award, *i.e.*, first-line supervisor, award committee, other after the employee has been nominated. I believe that nominations are discussed by all IT officers then a final decision is made by the IT Division Director (Ms. Emerson), however I do not know this for certain because Ms. Emerson, as the Director of the FRB's IT Division and/or other officers at the FRB, as previously noted do not inform candidates of nominations but rather just announces the awardees.

Regarding my limited knowledge of the process and the criteria used for nominating employees, I offer that in 2003 I submitted to Mr. Raymond Romero, my immediate supervisor, my nomination that Ms. Susan Barron, one of my previous employees, for the Board's Special achievement award. Following my nomination, I was not consulted concerning the process to confirm Ms. Barron for the award. This is because the Director of the FRB's IT Division and/or other officers at the FRB do not inform candidates of whether they are nominated for any award(s), nor do the Director of the FRB's IT Division and/or other officers at the FRB ever reveal the methods of nomination or consideration employed when making an award.

I believe that in the event I was not nominated for the award, which I have not way of knowing, and not selected, it is because of my race, my age and in retaliation for filing several EEO complainants. Marianne Emerson, the Director of the FRB's IT Division and/or other officers at the FRB do not inform candidates of whether they are nominated for any award(s) and because they do not reveal the methods of nomination or consideration employed when making an award, it is impossible for me to know whether I have ever been nominated for an award or if I was not

selected to receive the award if I was nominated.

I believe the nexus for retaliation for my EEO activity in not selecting me for the subject awarded is based on my June 14, 2004, removal of my then pending EEO complaints to federal district court in Washington, D.C., and on September 29, 2004, before the Court had the opportunity to issue a scheduling order, permitting me to obtain discovery, the Board filed a Motion to Dismiss, or in the Alternative, for Summary Judgment. On June 22, 2005, the District Court granted the Board's Motion to Dismiss, or in the Alternative, for Summary Judgment and denied my Motion to Stay Consideration of the Board's Motion for Summary Judgment and to Permit Discovery, Pursuant To Rule 56(f). On July 8, 2005, I filed a Rule 59(e) Motion for Reconsideration and Motion to Amend or Alter Judgment, but on August 23, 2005, the District Court denied the motion. On November 21, 2005, I appealed the district court's dismissal of my case, and seventeen days later, on December 8, 2005, Ms. Emerson and the Board selected Mr. Fred Vu, an Asian male under 40 years of age with less experience, inferior qualifications and less significant achievements, to receive the Board's Special Achievement Award.

I believe the non-selection of me for the subject award because of my race and age is when the Board selected an Asian male under 40 years of age with less experience, inferior qualifications and less significant achievements than me to receive the Board's Special Achievement Award in lieu of me because it felt free to do this in light of my case having recently been dismissed. This emboldened the Board again to start discriminating and retaliating against me, and I also believe that Ms. Emerson was acting in accordance with all of the discriminatory policies set forth above because she testified that this is the standard operating procedure at the Board. Finally, I believe that the Board was retaliating against me for having appealed the District Court's dismissal of my case. I also believe that Ms. Emerson was acting in accordance with all of the discriminatory policies set forth above because she testified that this is the standard operating procedure at the Board.

As supporting information and evidence that I should have been nominated and selected to receive the award, I offer the following: In January of 2004 a reorganization of the IT division combined into one unit the Mainframe Systems and Distributed Software Support (DSS) units. I was assigned responsibility for the new unit that was previously managed by two managers. Prior to this reorganization, management had considered abolishing the DSS unit. Moreover, productivity and performance suffered as previous managers found it difficult to motivate staff. On January 29, 2004, Ms. Emerson, three weeks before being deposed by my attorneys on Friday, February 20, 2004, in my then pending EEO action, informed me that in addition to my regular duties I was going to have to assume the work of another full time employee. At this point Ms. Emerson and the FRB essentially set me up to fail by assigning me to handle two existing management units with no increase in resources or any other means to successfully carry out the duties previously performed by two mangers. Accordingly, I filed my fourth the EEO complaint of retaliation on March 10, 2004.

However, within six months I successfully transformed the new unit into a highly motivated and productive technical team. That same year, a second reorganization combined the Data Center/Help Desk with the DSS unit forming the largest unit in IT. At the time I assumed responsibility for the Data Center, the unit had gone without a manager for almost a year. From

Page 9 of 14 – Affidavit of John Andrew Price     00004:     Initial 

RO100092

my years as manager of Mainframe Systems, I had first-hand knowledge of the problems and issues affecting the Data Center. The unit had languished for years. Staff knowledge and technical skills had become obsolete due, in part, to a diminished role of the mainframe. Moreover, staff attendance, behavior, and professionalism had deteriorated to dangerous levels; possibly justifying group adverse action. Working alongside Employee Relations and Legal, I immediately developed a plan to address the most serious problems. Though it was very stressful, tremendous positive change has occurred with all staff accepting greater responsibility for improving their performance.

My performance during this time was so good that even Ms. Emerson acknowledged it, as evidenced in the following e-mail she sent to me on December 14, 2005:

```
Fr:       Marianne Emerson
To:       John Price/BOARD/FRS
Date:     12/14/2004 08:50 PM
cc:       Maureen Hannan/BOARD/FRS@BOARD, Po Kim/BOARD/FRS@BOARD
Subject:  Re: Cash Award (Document link: John Price (Archive))

John,

You are very welcome. As Maureen said, your cash award is very well
deserved. We appreciate your commitment to do even more with your team
this year and we know that you have an ambitious plan laid out. The
manager's job is a challenging one and you are meeting that challenge.
We are glad that we have you with all of your experience as a member of
our team. You are one of the managers that we rely on.

Marianne

202-452-2045
```

Ms. Hannan and Mr. Kim then evaluated me for 2004, and they wrote that I had performed at an Outstanding level during the 2004 performance evaluation (PMP) review period (the ranking for PMP evaluations ranges as follows: 1=Unsatisfactory Performance, 2=Marginal Performance; 3=Commendable Performance, 4=Outstanding Performance, and 5=Extraordinary Performance).

During 2005 I restructured the Data Center operations and DSS into a modern IT Help Desk Service organization. With limited additional resources and using existing staff, I designed and proposed a service organization to IT Senior Management that was approved in January 2005. Since then, I lead the development of a Help Desk Agent training program, implemented a full-function automated Help Desk problem tracking system, a formal process for developing client trouble-shooting escalation procedures, and a web-based Help Desk knowledgebase system. Moreover, I coordinated with all IT infrastructure support units to design and implement, according to best practices, an integrated level 1 and level 2 support processes. I chair a staff briefing most mornings in the cafeteria to coordinate the numerous Help Desk client support activities.

As word spread of the success of the IT Help Desk, BS&R approached me to consider taking over their help desk support. With IT management's guidance, I negotiated and implemented a pilot agreement with BS&R to assume help desk support for their 235 clients. I coordinated with BS&R to develop a detailed pilot and transition plan. The pilot went into affect on February 1, 2006. To handle the increase in call volume and to distribute the workload, I developed and implemented formal "stations" each with specific tasks and responsibilities. In addition, I implemented a shift rotation program (known as the 4th and 5th shifts) that increased the number of first shift Help Desk Agents without increasing staff.

Preliminary results suggest that the nine month BS&R pilot will be a success. If so, over the next two years, IT will likely assume responsibility for all BS&R's desktop client support. In addition, other divisions have expressed interest in joining the Board's Help Desk. Within the next eighteen to twenty-four months, the Help Desk agents will be thoroughly trained in advanced level 1 desktop support and IT will be in a position to consider expanding the Help Desk service to other interested divisions.

On October 31, 2005, Ms. Emerson and the Board promoted Jill Rosen, a female with less experience, inferior qualifications and less significant achievements, to the officer level position of Assistant Director. However, despite the forgoing I still have not been promoted. On December 8, 2005, Ms. Emerson and the Board selected Mr. Fred Vu, an Asian male under 40 years of age with less experience, inferior qualifications and less significant achievements, to receive the Board's Special Achievement Award. Then on December 16, 2005, Ms. Emerson and the Board rated Mr. Peter Both, a white male under 40 years of age who has less experience, inferior qualifications and less significant achievements, Extraordinary on his most recent PMP. Ms. Emerson and Mr. Kim then evaluated me as having performed at an Outstanding level (a lower level than Extraordinary) during the same review period. No explanation was provided as to why I was not rated Extraordinary, however.

As justification for dismissing my case without allowing me to secure any discovery, the District Court relied upon evidentiary materials submitted by the Board as well as its understanding that I allegedly "had *some* discovery while his claims made their way through the Board and EEO process." On July 8, 2005, I filed a Rule 59(e) Motion for Reconsideration and Motion to Amend or Alter Judgment, but on August 23, 2005, the District Court denied the motion. On November 21, 2005, I appealed the district court's dismissal of my case, and we are currently awaiting a briefing schedule for the appeal.

### II. DISCRIMINATION BASED ON RACE, AGE AND RETALIATION (NON SELECTION TO RECEIVE THE SPECIAL ACHIEVEMENT AWARD).

I believe the process involved in nominating an employee for the subject award is that nominations are discussed by all IT officers then a final decision is made by the IT Division Director (Ms. Emerson), however I do not know this for certain because Ms. Emerson, as the Director of the FRB's IT Division and/or other officers at the FRB, do not inform candidates of whether they are nominated for any award(s), nor do the Director of the FRB's IT Division and/or other officers at the FRB ever reveal the methods of nomination or consideration employed when making an award. Rather, they just announce award winners after the decision is made.

Because the Director of the FRB's IT Division and/or other officers at the FRB do not inform candidates of whether they are nominated for any award(s) and because they do not reveal the methods of nomination or consideration employed when making an award, it is impossible for me to know whether I have ever been nominated for an award or if I was not selected to receive the award if I was nominated.

Moreover, on June 14, 2004, I removed my then pending EEO complaints to federal district court in Washington, D.C., and on September 29, 2004, before the Court had the opportunity to issue a scheduling order, permitting me to obtain discovery, the Board filed a Motion to Dismiss, or in the Alternative, for Summary Judgment. On June 22, 2005, the District Court granted the Board's Motion to Dismiss, or in the Alternative, for Summary Judgment and denied my Motion to Stay Consideration of the Board's Motion for Summary Judgment and to Permit Discovery, Pursuant To Rule 56(f). On July 8, 2005, I filed a Rule 59(e) Motion for Reconsideration and Motion to Amend or Alter Judgment, but on August 23, 2005, the District Court denied the motion. On November 21, 2005, I appealed the district court's dismissal of my case, and seventeen days later, on December 8, 2005, Ms. Emerson and the Board selected Mr. Fred Vu, an Asian male under 40 years of age with less experience, inferior qualifications and less significant achievements, to receive the Board's Special Achievement Award.

I believe that the Board selected an Asian male of less than 40 years of age with less experience, inferior qualifications and less significant achievements than me to receive the Board's Special Achievement Award in lieu of me because it felt free to do this in light of my case having recently been dismissed. This emboldened the Board again to start discriminating and retaliating against me, and I also believe that Ms. Emerson was acting in accordance with all of the discriminatory policies set forth above because she testified that this is the standard operating procedure at the Board. Finally, I believe that the Board was retaliating against me for having appealed the District Court's dismissal of my case. I also believe that Ms. Emerson was acting in accordance with all of the discriminatory policies set forth above because she testified that this is the standard operating procedure at the Board.

000047    Initial

Page 12 of 14 – Affidavit of John Andrew Price

ROI00095

### III. DISCRIMINATION BASED ON AGE AND RETALIATION (NONRECEIPT OF "EXTRAORDINARY" ON OCTOBER 2005 ANNUAL PERFORMANCE EVALUATION).

My October 2005 final annual performance evaluation (PMP) rating was Outstanding (the ranking for PMP evaluations ranges as follows: 1=Unsatisfactory Performance, 2=Marginal Performance; 3=Commendable Performance, 4=Outstanding Performance, and 5=Extraordinary Performance). My last two ratings prior to the October 2005 rating were my October 2004 PMP rating, which was Outstanding, and my 2003 PMP rating, which was Strong Commendable. My current first-line supervisor is Po Kim, age approximately 56, and he is responsible for rating me. I have previously complained about Mr. Kim in my prior EEO activity. The reviewing official for my PMP is Maureen Hannan, Deputy Director of IT Division (age approximately 52), and she is responsible for reviewing Mr. Kim's PMP rating of my work. I have previously complained about Maureen Hannan in my prior EEO activity.

I believe that my not being rated "Extraordinary" for the subject rating period is based on my age and retaliation, and I offer the following as evidence of same: On December 16, 2005, Ms. Emerson and the Board rated Mr. Peter Both, a white male under 40 years of age who has less experience, inferior qualifications and less significant achievements, Extraordinary on his most recent performance evaluation (PMP). Ms. Emerson and Mr. Kim contemporaneously evaluated me as having performed at an Outstanding level during the same review period (the ranking for PMP evaluations ranges as follows: 1=Unsatisfactory Performance, 2=Marginal Performance; 3=Commendable Performance, 4=Outstanding Performance, and 5=Extraordinary Performance). On November 21, 2005, I appealed the district court's dismissal of my case, and on December 16, 2005, Ms. Emerson and the Board rated a white male under 40 years of age who has less experience, inferior qualifications and less significant achievements, Extraordinary on his most recent PMP while it rated me only Outstanding. I believe that the Board was retaliating against me for having appealed the District Court's dismissal of my case. I also believe that Ms. Emerson was acting in accordance with all of the discriminatory policies set forth above, because she testified that this is the standard operating procedure at the Board.

I offer the following information on the performance standards for Outstanding Rating compared to the performance standard for Extraordinary Rating:

> EXTRAORDINARY PERFORMANCE: Performance that substantially and consistently exceeds the Board's high standards and expectations. This performance rating is reserved for a limited number of employees.

> OUTSTANDING PERFORMANCE: Performance that consistently meets and often exceeds the high standards of the job and the expectations of the position.

I have no information regarding the performance evaluation ratings of any other similarly situated employees.

000048   Initial

Page 13 of 14 – Affidavit of John Andrew Price


I have reviewed this statement, which consists of <u>14</u> pages, and hereby solemnly swear and affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____          _April 17, 2006_____
John Andrew Price                                  (Date)