**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **JOHN A. PRICE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Case No. 06-1569 (RCL)** |
| **v.** | ) |
| | ) |
| **BEN S. BERNANKE, CHAIRMAN,** | ) |
| **THE BOARD OF GOVERNORS OF** | ) |
| **THE FEDERAL RESERVE SYSTEM,** | ) |
| | ) |
| **Defendant.** | ) |

_____)

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO STAY**
**CONSIDERATION OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AND TO PERMIT DISCOVERY, PURSUANT TO RULE 56(f)**

Plaintiff John Price, by his undersigned counsel, respectfully submits this Memorandum

in Support of his Motion to Stay Consideration of Defendant's Motion for Summary Judgment

and to Permit Discovery, Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.

Plaintiff should be permitted discovery into the merits of his claims in this case because as

argued herein he cannot, for reasons stated by his Counsel, Nicholas Woodfield, Esq., and by

Plaintiff himself, present facts essential to justify his opposition to Defendant's Motion for

Summary Judgment filed on September 29, 2004.

**GOVERNING STANDARDS**

Under Rule 56(c), provides, summary judgment is proper "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed R. Civ. P. 56(c).  The Supreme Court has interpreted Rule 56(f)

in determining the standard for granting motions for summary judgment.  In *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)*,* for example the Court addressed the burden to be placed on the nonmoving party as follows:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, *after adequate time for discovery* and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex*, 477 U.S. at 322 (1986) (emphasis added).

The rule governing summary judgment motions provides that:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f).

It is well established that a plaintiff should be afforded "a reasonable opportunity to complete discovery before grappling with a summary judgment motion." *Martin v. Malhoyt*, 830 F.2d 237, 256 (D.C. Cir.1987) ("any potential problem with ... premature [summary judgment] motions can be adequately dealt with under Rule 56(f), which allows [deferral of] a summary judgment motion… if the nonmoving party has not had an opportunity to make full discovery"); *see also Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1117 (D.C. Cir. 2000) (*citing Bennett v. Schmidt*, 153 F.3d 516, 519 (7th Cir. 1998) ("Litigants are entitled to discovery before being put to their proof.")).  Given that "[i]t is well settled that conclusory allegations unsupported by factual data will not create a triable issue of fact," a party requesting more time for discovery had to, in her affidavit, "indicate what facts she intended to discover that would create a triable issue and why she could not produce them in opposition to the motion." *Carpenter v. Fed. Nat'l*

*Mortgage Ass'n*, 174 F.3d 231, 237 (D.C. Cir. 1999) (citing *Strang v. Arms Control &*

*Disarmament Agency*, 864 F.2d 859, 861 (D.C. Cir. 1989); *Exxon Corp. v. FTC*, 663 F.2d 120,

126-27 (D.C. Cir. 1980)).

## ARGUMENT

I.     **Mr. Price Requires Discovery To Demonstrate A Requisite Element Of His Case,
       *i.e.*, That The Board's Allegedly Legitimate, Nondiscriminatory Reasons For Not
       Promoting Him, For Lowering His Ratings, And For Not Awarding To Him A
       Special Achievement Award Are Pretextual.**

In the attached declarations of Nicholas Woodfield, attached hereto as Ex. 1, and John

Price, attached as Ex. 2, Plaintiff submits that the undersigned has reviewed the Board's Motion

for Summary Judgment, as well as the declarations of Ms. Marianne Emerson and Mr. Po Kim,

which the Board offers as evidence of its legitimate, nondiscriminatory reasons for promoting a

female employee instead of Mr. Price and for giving him an inferior evaluation than it gave to a

younger employee and for not awarding him a Special Achievement Award when it gave the

same award to a younger, Asian American employee.  However, the substantive claims made in

Ms. Emerson's and Mr. Kim's declarations do not reconcile with the factual account reported by

Mr. Price in his declaration, a copy of which follows this declaration.  The undersigned has

reviewed the Board's Motion for Summary Judgment and its accompanying statement of

material facts, and the undersigned has concluded that Mr. Price requires the opportunity,

pursuant to Rule 56(f), to empirically prove the Board's allegedly legitimate, nondiscriminatory

reasons for promoting a female employee instead of Mr. Price and for giving him an inferior

evaluation than it gave to a younger employee and for not awarding him a Special Achievement

Award when it gave the same award to a younger, Asian American employee are, in fact,

pretextual excuses offered to hide its illegal acts.

The Board argues in its Motion that Ms. Emerson promoted Ms. Rosen because, as attested to in Ms. Emerson's declaration, Ms. Emerson claims that she subjectively believed that Ms. Rosen was the most qualified candidate for the position.  Thus the Board asserts that it has provided a legitimate, non-discriminatory for promoting Ms. Rosen instead of Mr. Price, and this forms the basis for its claim that it is entitled to Counts I and II, which assert claims for discrimination under Title VII the ADEA, respectively, as they relate to Ms. Rosen.  However, Mr. Price submits that he has superior qualifications and experience to Ms. Rosen and was therefore the best qualified candidate for the position:

6. As mentioned above, on October 31, 2005, Ms. Emerson and the Board promoted Jill Rosen, a female with less experience, inferior qualifications and less significant achievements than I have, to the officer level position of Assistant Director.  I am more experienced, more qualified and have greater achievements than Ms. Rosen because I have over thirty-five years of technical and managerial experience in the field of Information Technology, as well as a Bachelor or Science, Technology of Management, American University, 1975.  I worked for nine years as a Financial/Business software and data base developer including advanced systems analysis and programming in Assembler (IBM), high-level general purpose languages, and data base management systems working for organizations that include the Library of Congress and the Energy Department.  I have worked for twenty-six years in the Information Technology Division, Board of Governors.  My experience directly relevant to the position awarded to Ms. Rosen includes:

- Eight years as a Senior Communications Analyst/Systems Programmer;

- Two years as Chief of Telecommunications, Information Resource Management, where I Managed three advanced technology teams (local area network, wide-area networks, and electronic mail applications);

- Eight years as a Enterprise Network Manager, where my Management responsibilities included development, implementation, and operation of the Board's network architecture and services;

- Six years managing the Board's Large Systems (mainframe) team; and

- Two years managing the Board's Data Center, IT Help Desk, and Distributed Software Support team.

The forgoing qualifications, experience, and achievements are superior to Ms. Rosen's qualifications, experience, and achievements, and this is clear by comparing them directly with paragraphs nine and ten in Ms. Emerson's declaration filed in support of the Board's Motion for Summary Judgment:

> 9.   Ms. Rosen's first assignment in the IT Division was as an applications manager in the Statistical Services branch, which included the NIC.  As an applications manager, Ms. Rosen was responsible for assisting in the development, maintenance and testing of customized software applications that work specifically with the NIC.  The job required Ms. Rosen to have a strong familiarity with the NIC's architecture.
>
> 10.   At the time I made my decision to appoint Ms. Rosen to the position of Assistant Director, in October 2005, I knew she had at least nineteen years of experience in the IT field, at least eight of which had been devoted exclusively to database administration in the Board's Management Division.  I also knew that Ms. Rosen had a strong understanding of the NIC's existing architecture because she had been successfully working with it since joining the IT Division in July 2000.  Given her specialized experience, I believed Ms. Rosen possessed the knowledge, skill and ability to oversee the development and design of customized software
>
> applications that could be used in the NARI effort.

Declaration of Marianne Emerson, ¶¶ 9-10, pp. 2-3, Ex. D, Defendants' Motion for Summary Judgment.

7.   In fact, I was better qualified than Ms. Rosen for the Assistant Director position in question because through my numerous technological assignments I have demonstrated the extraordinary ability to rapidly assimilate complex technical information in all areas of information technology.  In addition, during my twenty-six years at the Board I have participated in the implementation of countless client business technical solutions, like ASAP and FIRMA, which is what the Assistant Director position in question is tasked with doing.  Moreover, through my experience I have developed a superior knowledge of Board business, applications, and systems, and the extent of my knowledge in these relevant areas is greater than Ms. Rosen's.

Price Declaration at ¶¶ 6-7.

Accordingly Mr. Price requires Ms. Rosen's qualifications and performance history as well as the written job requirement documentation for the vacancy (including job and candidate requirements).  Mr. Price requires this discovery from the Board as it is not available from any other sources, and he requires this information to empirically demonstrate both that he was the more qualified candidate for the position and that Ms. Emerson's subjective reasons, the Agency's allegedly legitimate, non-discriminatory for promoting Ms. Rosen instead of Mr. Price,

are in fact untrue.  Thus Mr. Price requires this discovery in order to prove a requisite element of

his case, *i.e.*, pretext, as the Board itself notes in its Motion for Summary Judgment:

> Summary judgment may be granted for the defendant even where plaintiff has established
> a prima facie case unless the plaintiff "produce[s] substantial probative evidence that the
> proffered reason was not the true reason for the employment decision and that the real
> reason was [discriminatory animus]." *Gleklen v. Democratic Congressional Campaign
> Comm., Inc.*, 199 F.3d 1365, 1367-68 (D.C. Cir. 2000).  In other words, <u>"it is not enough
> for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible.
> He must show that the explanation given is a phony reason."</u> *Fischbach v. D.C. Dep't of
> Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

Defendant's Motion for Summary Judgment at 5 (emphasis added).

The Board also argues in its Motion that Mr. Kim supervised and evaluated both Mr.

Price and Mr. Peter Both, but it contends that they are (1) not comparable because not similarly

situated and (2) Mr. Kim subjectively was more impressed with Mr. Both and thus rated him

higher than Mr. Price.  Thus the Board claims that it provided given a legitimate, non-

discriminatory for evaluating Mr. Both higher than Mr. Price, and this forms the basis for its

claim that it is entitled to Counts I and II, which assert claims for discrimination under Title VII

the ADEA, respectively, as they relate to Mr. Both.  However, Mr. Price submits that both he

and Mr. Both had similar job duties and responsibilities despite their job titles and thus they are

similarly situated for comparison purposes:

> 8.  Peter Both and I have similar job duties and responsibilities despite our
>     different job titles and thus we are similarly situated for comparison purposes.
>     As a grade 28 manager (at the time of the discrimination), I managed the
>     Mainframe Systems team for six years prior to the IT reorganization in which
>     Mr. Peter Both was selected as a grade 27 manager.  There is no distinction in
>     responsibilities or duties between a Unit Manager grade 27 and 28, and it is
>     the same position and the job descriptions are identical.  We were also doing
>     comparable work, were evaluated similarly, and we received the same
>     evaluation comments.  Both and I managed a similar mix of technical staff
>     consisting of exempt and non-exempt employees, and we were both
>     responsible for advance technology projects of similar complexity.
>     Moreover, Mr. Both and I have the same administrative reporting
>     responsibilities.  We were also rated in the same manner, as the Board, and

especially the IT division, has a stated goal of a bell-curve performance (PMP) rating distribution.  As a result, all employees, regardless of grade, compete for the restricted number of PMP ratings of Outstanding and Extraordinary.  The goal for the number of outstanding ratings and Extraordinary for each IT branch is approximately 20%, and because of our comparable jobs and comparable responsibilities we are evaluated comparably.

Price Declaration at ¶ 8.

Accordingly he requires both his and Mr. Both's annual performance reviews and evaluations, written job descriptions, achievements and awards, and Mr. Kim's notes to empirically demonstrate that he and Mr. Both were doing comparable work, were evaluated similarly, and that they received the same evaluation comments but that Mr. Kim rated Mr. Both more highly than Mr. Price even though Mr. Price was more competent and better performing. Mr. Price requires these discovery materials to demonstrate that Mr. Kim's reasons, the Board's allegedly legitimate, non-discriminatory for evaluating Mr. Both superior to Mr. Price, is in fact pretext.

The Board also argues in its Motion for Summary Judgment that Mr. Fred Vu, a younger, Asian-American colleague of Mr. Price, was one of the individuals selected to receive the Special Achievement Award in question on the basis of certain specific criteria:

The Board has specific criteria used for nominating and selecting individuals to receive the Special Achievement Award. See Exhibit H, ROI00277-00278, "Special Achievement Awards Program." Candidates are evaluated on one or more of the following stringent standards:

- extraordinary achievements that result in significant cost savings for the Board or the Federal Reserve Banks,

- extraordinary efforts that result in improving or increasing productivity or improving the quality of output,

- extraordinary efforts in management of programs, particularly those that enable the Board to reallocate resources to other high-priority activities,

- extraordinary personal initiative and innovation

- sustained superior performance.

Defendant's Motion for Summary Judgment at 21.

As is evidenced in Exhibit H to the Board's Motion for Summary Judgment and p. 21 of

Defendant's Motion for Summary Judgment, there is more than one recipient of the Board's

Special Achievement Awards in its Special Achievement Awards program.  The Board submits

that Mr. Vu met the criteria above, and it submits the following basis as its legitimate business

reason for award the Special Award to Mr. Vu but not to Price:

> "Nevertheless, [Mr. Kim] felt that [plaintiff] had not achieved the level of performance
> required to be nominated for the Board's Special Achievement Award." Id. at ¶ 5. Indeed,
> Mr. Kim did not nominate any of his subordinates for the award. Id. at ¶ 4.
> Moreover, Fred Vu, the IT employee who was nominated and selected for the award
> certainly met the criteria for it. According to Marianne Emerson, Mr. Vu "had played a
> key role in establishing disaster-recovery systems for the Board. Fred demonstrated
> extraordinary personal initiative, creativity and innovation in strengthening the Board's
> telecommunications infrastructure. He completed an extraordinary project in an
> extraordinary manner." Emerson Decl., Exh. D, at ¶ 13.

Defendant's Motion for Summary Judgment at 22.  Thus the Board claims that it is entitled to

Counts I and II, which assert claims for discrimination under Title VII the ADEA, respectively,

as they relate to Mr. Vu.  However, Mr. Price submits that his achievements were superior to Mr.

Vu's achievements and that in the time period in question from 2004 to 2005 he met all of the

requisite standards to qualify for a Special Award.  He had had extraordinary achievements that

resulted in significant cost savings for the Board.  He had also made extraordinary efforts that

resulted in improving and increasing both productivity and improving the quality of output.  He

had also made extraordinary efforts in management of programs, particularly those that enable

the Board to reallocate resources to other high-priority activities.  He had also demonstrated

extraordinary personal initiative and innovation and had at all times sustained superior

performance.  Specifically, Mr. Price claims that:

9.  In the time period in question from 2004 to 2005 I met all of the requisite standards to qualify for a Special Award.  I had extraordinary achievements that resulted in significant cost savings for the Board.  I also made extraordinary efforts that resulted in improving and increasing both productivity and improving the quality of output.  I also made extraordinary efforts in management of programs, particularly those that enable the Board to reallocate resources to other high-priority activities.  I also demonstrated extraordinary personal initiative and innovation and had at all times sustained superior performance.

10. For example, in January of 2004 a reorganization of the IT division combined into one unit the Mainframe Systems and Distributed Software Support (DSS) units.  I was assigned responsibility for the new unit that was previously managed by two managers.  Prior to this reorganization, management had considered abolishing the DSS unit.  However, within six months I successfully transformed the new unit into a highly motivated and productive technical team.  That same year, a second reorganization combined the Data Center/Help Desk with the DSS unit forming the largest unit in IT.  At the time I assumed responsibility for the Data Center, the unit had gone without a manager for almost a year.  From my years as manager of Mainframe Systems, I had first-hand knowledge of the problems and issues affecting the Data Center.  The unit had languished for years.  Staff knowledge and technical skills had become obsolete due, in part, to a diminished role of the mainframe.  Moreover, staff attendance, behavior, and professionalism had deteriorated to dangerous levels; possibly justifying group adverse action.  Working alongside Employee Relations and Legal, I immediately developed a plan to address the most serious problems.  Though it was very stressful, tremendous positive change has occurred with all staff accepting greater responsibility for improving their performance.

11. During 2005 I restructured the Data Center operations and DSS into a modern IT Help Desk Service organization.  With limited additional resources and using existing staff, I designed and proposed a service organization to IT Senior Management that was approved in January 2005.  Since then, I lead the development of a Help Desk Agent training program, implemented a full-function automated Help Desk problem tracking system, a formal process for developing client trouble-shooting escalation procedures, and a web-based Help Desk knowledgebase system.  Moreover, I coordinated with all IT infrastructure support units to design and implement, according to best practices, an integrated level 1 and level 2 support processes.  I chair a staff briefing most mornings to coordinate the numerous Help Desk client support activities.

12. As word spread of the success of the IT Help Desk, the Board's Division of Bank Supervision and Regulation (BS&R) approached me to consider assuming their entire internal help desk client support. With IT management's guidance, I negotiated and implemented a pilot agreement with BS&R to assume help desk support for their 235 clients. I coordinated with BS&R to develop a detailed pilot and transition plan. The pilot went into affect on February 1, 2006. To handle the increase in call volume and to distribute the workload, I developed and implemented formal "stations" each with specific tasks and responsibilities. In addition, I implemented a shift rotation program (known as the 4th and 5th shifts) that increased the number of first shift Help Desk Agents without increasing staff.

13. The results of the nine-month BS&R pilot were deemed a success by both IT and BS&R senior management. As a result of this extraordinary success, I was tasked by Mr. Po Kim, Ms. Maureen Hannan, and Ms. Marianne Emerson, to complete a phase II production implementation plan that will expand the pilot services to include all help desk level 1 and desktop level 2 support. In addition, the Division of Research and Statistics (R&S), the Division of Monetary Affairs (MA), and the Office of the Staff Director for Management (OSDM) – Continuity of Operations (COOP) have expressed serious interest in joining my new Help Desk service organization. Within the next eighteen to twenty-four months, the Help Desk agents will be thoroughly trained in advanced level 1 desktop support and IT will be in a position to consider expanding the Help Desk service to virtually all Board divisions while expanding the services offerings.

Price Declaration at ¶¶ 9-13.

Accordingly Mr. Price requires the Board's annual evaluations and performance reviews for both he and Mr. Vu to empirically demonstrate bother that that they were evaluated similarly and also to prove that Mr. Vu was not performing in a more extraordinary manner than was Price. Moreover, Mr. Price requires Mr. Kim's notes and documentation memorializing Mr. Vu's achievements and awards, as Price requires these discovery materials to demonstrate that Mr. Kim's and Ms. Emerson's reasons, the Agency's allegedly legitimate, non-discriminatory for awarding a Special Award to Mr. Vu but not to Mr. Price, is in fact pretext.

II.    **Mr. Price Requires Discovery To Demonstrate That Board's Evidence In Support Its Argument That Mr. Price Cannot Demonstrate Causation Is Manufactured And Untrue.**

The Board argues in its Motion for Summary Judgment that Mr. Kim and Ms. Emerson could not have retaliated against Mr. Price because they had no timely knowledge of his protected activities.  Therefore the Board claims, based upon the statements in Ms. Emerson's and Mr. Kim's declarations, that Mr. Price cannot make a *prima facie* case of retaliation on any of the three bases he submitted, as it claims he cannot demonstrate a causal connection between his protected activities and any adverse employment actions because he allegedly cannot demonstrate that the alleged decision makers were aware of his recent EEO activity when they made the decisions in question.  Accordingly, the Board asserts that it is entitled to summary judgment on Counts III and IV of Mr. Price's complaint, which assert claims for causes of action under Title VII and the ADEA, respectively, for retaliation.  Mr. Price contradicts Mr. Kim's and Ms. Emerson's declarations when he declares:

3.    Between January 29, 2004, and March 3, 2004, as a result of the January 29, 2004, reorganization of the Information Technology (IT) Division that resulted in my assuming the full managerial responsibilities of the IT Distributed Software Support (DSS) unit along with my existing managerial responsibilities of the Mainframe Systems Support unit, I specifically informed my direct supervisor, Mr. Po Kim, on several occasions that I was currently engaged in an EEO action against the Board.

4.    Moreover, from 2004 through 2006 I posted a printed copy of a list of legal actions, including and highlighting my federal district court case, on my office bulletin board where it was visible to everyone entering my office.  During this period of time Ms. Marianne Emerson and Mr. Kim had entered my office on numerous occasions.  Also, Mr. Kim and I often conducted meetings in my office.  Thus Mr. Kim's claim that at the time he issued my 2005 PMP on October 24, 2005, that he was unaware of any EEO activity on my part is not accurate.  Moreover, his claim that at the time he made the decision not to nominate me in the fall of 2005 for the Board's Special Achievement Award that he was unaware of any EEO activity on my part or that I had filed a complaint in district court therefore is not accurate.

5.  Ms. Emerson told me on numerous occasions starting in the late 1990s that all personnel actions, adverse actions, reorganizations, promotions, etc., are thoroughly discussed, "behind closed doors" by all IT officers before any decisions are made.  In the months and years after I made my EEO complaints my counsel deposed Ms. Emerson on February 20, 2004.  Four months later, on June 14, 2004, I filed a Complaint in the United States District Court for the District of Columbia alleging that, *inter alia*, Ms. Emerson retaliated against me in reprisal for engaging in Equal Employment Opportunities activities.  On September 29, 2004, the FRB filed a Motion to Dismiss, or in the Alternative, for Summary Judgment.  On October 26, 2004, I filed an opposition to the FRB's Motion to Dismiss, or in the Alternative, for Summary Judgment.  On June 22, 2005, the district court granted the FRB's Motion to Dismiss, or in the Alternative, for Summary Judgment, and I filed a Motion for Reconsideration and Motion to Alter or Amend on July 8, 2005. The District Court denied my Motion for Reconsideration and Motion to Alter or Amend on August 23, 2005, and so I filed a Notice of Appeal on September 15, 2005.  On October 31, 2005, Ms. Emerson and the Board promoted Jill Rosen, a female with less experience, inferior qualifications and less significant achievements than I have, to the officer level position of Assistant Director.  I understand that Ms. Emerson has declared that she was not aware of any specific actions taken by me regarding my lawsuit between August and December of 2005, but that would mean that my law suit, and significantly my appeal on September 15, 2005, was not thoroughly discussed "behind closed doors" by all IT officers even though Ms. Emerson told me that this was the normal course of business.  Thus based on her own statement I believe Ms. Emerson's claim that she was not aware of any specific actions taken by me regarding my lawsuit between August and December of 2005 is untrue.

Price Declaration at ¶¶ 3-5.

The Board argues that Ms. Emerson's general awareness of Mr. Price's claims, "starting 15 months prior to the alleged retaliatory action – is too remote in time to act as a trigger for retaliation in October 2005.  And Ms. Emerson was 'not aware of any specific actions taken by [plaintiff] regarding [Price I] during the time period between August and December 2005.'" Defendant's Motion for Summary Judgment at 11.  However, in the forgoing Defendant implicitly acknowledges that Ms. Emerson was aware as recently as July of 2005, that she was aware specific actions taken by Price concerning his EEO complaints.  Moreover, Mr. Price submits, *supra*, that Ms. Emerson told him that as an IT officer she would have been advised of

significant personnel actions. Moreover the only action Price took in July of 2005 in Price I was filing his motion to reconsider, and presumably this is the specific action Ms. Emerson admits to learning about when she qualified her claim that she was "not aware of any specific actions taken by [plaintiff] regarding [Price I] during the time period between August and December 2005." Therefore, in light of her own testimony and Mr. Price's declaration testimony asserting that Ms. Emerson told him that as an IT officer she would have been advised of significant personnel actions, it defies logic to believe that Ms. Emerson and the other IT officers at the Board would have discussed Mr. Price's motion to reconsider in his prior EEO district court filing but not his filing his appeal in his prior EEO district court filing.

Moreover, while a close temporal proximity can in and of itself give rise to an inference of causation sufficient to establish a *prima facie* case of retaliation many courts have determined that the lack of close temporal proximity does not by itself preclude a causal relationship.[1] As this Court recognized in *Buggs v. Powell*, 293 F. Supp. 2d 135, 149 (D. D.C. 2003), temporal proximity is but one method of proving retaliation. Evidence of discriminatory or disparate

---

[1] *See Porter v. California Dept. of Corrections*, 2004 U.S. App. LEXIS 19070 (9th Cir. 2004) (4.5 years between the protected activity and the retaliation with the same personnel involved in both, evidence of retaliatory motive, periodic demonstrations of animus and new opportunity to effect retaliation. The court stated, "A rule that any period over a certain time is per se too long…would be unrealistically simplistic." *Id.* at *33-34 (internal cite omitted).; *Chan v. NYU Downtown Hosp.*, 2004 WL 213024 (S.D. N.Y. 2004) (2.5 years); *Nesmith v. Independence Blue Cross*, 2004 WL 253524 (E.D. Pa. 2004) (two years where a pattern of antagonism evident); *Twyman v. Dilks*, 2000 WL 1277917 (E.D. Pa. 2000) (nearly 3 years where a pattern of antagonism evident and same supervisor involved in both the protected action and the retaliation); *Woodson v. Scott Paper Co.*, 109 F.3d 913 (3rd Cir. 1997) (over two years based on the evidence as a whole); *Hayes v. Shalala*, 902 F.Supp. 259 (D. D.C. 1995) (three years where the same supervisor involved in both protected action and retaliation and first opportunity to retaliate); *Robinson v. Southeastern Pennsylvania Transp. Auth.*, 982 F.2d 892, 894 (3rd Cir. 1993) (nearly two years; "The mere passage of time is not legally conclusive proof against retaliation." (*Citing Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 43 (5th Cir. 1992)); *Globus v. Skinner*, 721 F.Supp. 329 (D. D.C. 1988) (two years where plaintiff's participation in litigation lasted until shortly before she was laid off).

treatment in the time period between the protected activity and the adverse employment action can be sufficient to show a causal connection. Moreover, this Court recognized in *Broderick v. Donaldson*, 2004 WL 2166165 (D. D.C. 2004), that even a period as long as ten years between a plaintiff's protected activity and the employer's alleged retaliation is insufficient by itself to preclude a plaintiff's establishing causation in a Title VII retaliation case, reasoning that:

> Pretermitting the issue of temporal proximity, there are other factors that can help establish causation absent a clear or express statement, including whether the individuals involved in the protected activity are the same as those in the adverse action, and whether the parties have any motive for retaliating.

*Id.* at 10 (emphasis added).

In the matter before the Court, in the time between when Mr. Price engaged in protected activities and when he asserts that he was terminated in retaliation for engaging in protected activity, individuals named in Mr. Price's initial protected activity, including Ms. Emerson and Mr. Kim, were constantly aware of Mr. Price's activities. Mr. Price's counsel deposed Ms. Emerson on February 20, 2004. Four months later, on June 14, 2004, he filed a Complaint in the United States District Court for the District of Columbia alleging that, *inter alia*, Ms. Emerson retaliated against him in reprisal for engaging in Equal Employment Opportunities activities. On September 29, 2004, the FRB filed a Motion to Dismiss, or in the Alternative, for Summary Judgment, and on October 26, 2004, he filed an opposition to the FRB's Motion to Dismiss, or in the Alternative, for Summary Judgment. On June 22, 2005, the district court granted the FRB's Motion to Dismiss, or in the Alternative, for Summary Judgment, and he filed a Motion for Reconsideration and Motion to Alter or Amend on July 8, 2005. Ms. Emerson does not deny that she was aware of the forgoing, and her claimed lack of familiarity with Mr. Price's EEO activities is limited to the last three months preceding her taking an adverse employment action after she had been aware of his activities for two years.

In *Smith International, Inc. v. National Labor Relations Board*, 45 F.3d 440 (10th Cir. 1995), the retaliating employer argued that a gap of eleven months between the employee's protected activity and the adverse employment action negated any animus that may have existed. The Tenth Circuit disagreed and explained that this argument was "erroneous both at law and in fact." *Id.* at 4 (*Citing N.L.R.B. v. Albion Corp.*, 593 F.2d 936, 939) (10th Cir. 1979). The *Smith International* Court pointed out that the employer's institutional memory revealed a pattern of hostile conduct that evidenced that the employer's lingering retaliatory animus had been evidenced in the workplace for several years despite the passage of time:

> In fact, the record reveals Smith's institutional memory to be well in excess of eleven months. When Mr. Ruiz discussed his poor review with William Werling, Mr. Werling attributed part of the low rating on discretion to an incident that had taken place two years earlier. Mr. Ruiz had made an insurance claim that engendered some ill will between Mr. Ruiz and Karen Banta, who administered such claims for the company. Mr. Werling stated Mr. Ruiz had handled the matter poorly. Mr. Ruiz asked, "[W]hat does an incident that happened two years ago have... to do with an appraisal for the last six months?" Mr. Werling did not answer, except to complain about Mr. Ruiz' involvement in a local mayoral race. Finally, when Mr. Ruiz was advised of his layoff, the hallway leading out of his place of work was lined with a gauntlet of Smith management. They were on hand because "they expected trouble" from Mr. Ruiz. The ALJ could easily infer Smith's anti-union animus to be alive and well despite the time elapsed.

*Smith International* at 4.

The *Smith International* Court's reasoning is equally applicable in the matter presently before the Court. Mr. Price identified Ms. Emerson as a discriminator in the prior proceedings, and he claims that Ms. Emerson, whom he had initially complained about, has treated him over the years in a manner that was inconsistent with the treatment of his coworkers. The *Buggs* Court also contemplated this very scenario when it noted that:

> where there is a lack of temporal proximity, circumstantial evidence of a "pattern of antagonism" following the protected conduct can also give rise to the inference. These are not the exclusive ways to show causation, as the proffered evidence, looked at as a

whole, may suffice to raise the inference.

*Buggs,* 293 F.Supp. 2d at 149.

The *Buggs* Court therefore rejected the temporal proximity argument offered by the Defendant,

as it determined that:

> Here, the proffered evidence as a whole, when viewed in the light most favorable to the plaintiff, creates an inference of retaliatory discrimination with respect to the plaintiff's non-selection as Chief of the Building Operations Unit, even though its proximity to the protected activity would not alone support such an inference.

*Id.*

Accordingly, Mr. Price undermines the Board's summary judgment argument that Mr.

Kim and Ms. Emerson could not have retaliated against Mr. Price because they had no timely

knowledge of his protected activities and thus he cannot make a *prima facie* case, and therefore

Mr. Price requires discovery to demonstrate that Board's evidence in support its argument is

manufactured and untrue before he should be forced to respond to summary judgment.

## CONCLUSION

The Court should grant Mr. Price's Rule 56(f) motion, as he cannot make a sufficient

showing on the essential elements of his case without proper and full discovery, and with respect

to which he has the burden of proof in the pending Motion for Summary Judgment.  Mr. Price

cannot effectively address the Board's arguments on the merits, except to the limited extent

necessary to show that there are colorable issues for which discovery is necessary.  If this Court

does not grant the instant Motion, it would effectively restrict Mr. Price's ability to parry the

claims made in Defendant's Motion for Summary Judgment, creating an unjust conclusion.  For

the foregoing reasons, the Court should grant Mr. Price the opportunity for discovery in support

of his claim and DENY or STAY Defendant's motion for summary judgment pending the

completion of discovery.

Respectfully submitted,
John A. Price,
  *By Counsel*


  /s/   Nicholas Woodfield
R. Scott Oswald, Esq. (D.C. Bar # 458859)
Nicholas Woodfield, Esq. (D.C. Bar # 471801)
Employment Law Group, PLLC
888 17th Street, NW, Suite 900
Washington, D.C. 20006-3307
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.net
*Counsel for Plaintiff*