# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN A. PRIVATE, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BEN S. BERNANKE, CHAIRMAN, ) <br> THE BOARD OF GOVERNORS OF ) <br> THE FEDERAL RESERVE SYSTEM, ) <br> ) <br> Defendant. ) | Case No. 06-1569 (RCL) |


JOHN A. PRICE,

    Plaintiff,

v.   Case No. 06-1569 (RCL)

BEN S. BERNANKE, CHAIRMAN,
THE BOARD OF GOVERNORS OF
THE FEDERAL RESERVE SYSTEM,

    Defendant.

**DECLARATION OF NICHOLAS WOODFIELD, ESQ. IN SUPPORT OF
PLAINTIFF'S MOTION TO STAY CONSIDERATION OF DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND TO PERMIT DISCOVERY**

I, Nicholas Woodfield, do hereby depose and say:

1.    I am over eighteen years of age, have personal knowledge of the facts recited herein, and am competent to testify.

2.    I am admitted to practice law in Maryland, Virginia, Alabama, the District of Columbia, the U.S. District Court for the District of Maryland, the U.S. District Courts for the Eastern and Western Districts of Virginia, the U.S. District Court for the District of Columbia, U.S. Court of Appeals for the District of Columbia Circuit, the U.S. Court of Appeals for the Fourth Circuit, and the Supreme Court of the United States.

3.    I am an Attorney of Record on behalf of the Plaintiff John Price. As such, I am familiar with aspects of his claims in this matter.

4.    In his complaint Mr. Price alleges that the Board of Governors of the Federal Reserve System discriminated against him on the bases of race (white/Caucasian), sex (male), and age (D.O.B. April 24, 1952) in violation of Title VII of the Civil Rights Act of 1964 (Title

VII), as amended, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 621 et seq. Mr. Price avers that the Board discriminated against him by underrating Mr. Price, by not awarding him a Special Achievement Award, and by promoting less qualified employees in lieu of Mr. Price as part of a systemic pattern and practice of disproportionately and disparately favoring minorities, females, and younger employees for hiring and promotion and for awarding remuneration and employment benefits within the Board, specifically in the Information Technology Division. Further, Mr. Price avers that in violation of Title VII and the ADEA the Board illegally retaliated against Price for his previously having engaged in Equal Employment Opportunities activities by underrating Mr. Price, by not awarding him a Special Achievement Award, and by promoting less qualified employees in lieu of Mr. Price.

     5.     The Board filed a Motion for Summary Judgment along with its answer in the above-captioned matter, and the Motion for Summary Judgment was filed prior to discovery. In support of its Motion for Summary Judgment, the Board has offered, *inter alia,* the declarations of Ms. Marianne Emerson and Mr. Po Kim as evidence of its legitimate, nondiscriminatory reasons for promoting a female employee instead of him and for giving him an inferior evaluation than it gave to a younger employee and for not awarding him a Special Achievement Award when it gave the same award to a younger, Asian American employee. However, the substantive claims made in Ms. Emerson's and Mr. Kim's declarations do not reconcile with the factual account reported by Mr. Price in his declaration, a copy of which follows this declaration. I have reviewed the Board's Motion for Summary Judgment and its accompanying statement of material facts, and I have concluded that Mr. Price requires the opportunity, pursuant to Rule

56(f), to discover information that is essential to his opposition prior to opposing the Board's summary judgment.

6. Specifically, the Board argues in its Motion for Summary Judgment that Mr. Kim and Ms. Emerson could not have retaliated against Mr. Price because they had no timely knowledge of his protected activities. Therefore the Board claims, based upon the statements in Ms. Emerson's and Mr. Kim's declarations, that Mr. Price cannot make a *prima facie* case of retaliation on any of the three bases he submitted, as it claims he cannot demonstrate a causal connection between his protected activities and any adverse employment actions because he allegedly cannot demonstrate that the alleged decision makers were aware of his recent EEO activity when they made the decisions in question. Accordingly, the Board asserts that it is entitled to summary judgment on Counts III and IV of Mr. Price's complaint, which assert claims for causes of action under Title VII and the ADEA, respectively, for retaliation.

7. However in his declaration Mr. Price contradicts Mr. Kim's and Ms. Emerson's declarations when he declares:

> 3. Between January 29, 2004, and March 3, 2004, as a result of the January 29, 2004, reorganization of the Information Technology (IT) Division that resulted in my assuming the full managerial responsibilities of the IT Distributed Software Support (DSS) unit along with my existing managerial responsibilities of the Mainframe Systems Support unit, I specifically informed my direct supervisor, Mr. Po Kim, on several occasions that I was currently engaged in an EEO action against the Board.
>
> 4. Moreover, from 2004 through 2006 I posted a printed copy of a list of legal actions, including and highlighting my federal district court case, on my office bulletin board where it was visible to everyone entering my office. During this period of time Ms. Marianne Emerson and Mr. Kim had entered my office on numerous occasions. Also, Mr. Kim and I often conducted meetings in my office. Thus Mr. Kim's claim that at the time he issued my 2005 PMP on October 24, 2005, that he was unaware of any EEO activity on my part is not accurate. Moreover, his claim that at the time he made the decision not to nominate me in the fall of 2005 for the Board's Special Achievement Award

3

>that he was unaware of any EEO activity on my part or that I had filed a complaint in district court therefore is not accurate.
>
>5. Ms. Emerson told me on numerous occasions starting in the late 1990s that all personnel actions, adverse actions, reorganizations, promotions, etc., are thoroughly discussed, "behind closed doors" by all IT officers before any decisions are made. In the months and years after I made my EEO complaints my counsel deposed Ms. Emerson on February 20, 2004. Four months later, on June 14, 2004, I filed a Complaint in the United States District Court for the District of Columbia alleging that, *inter alia*, Ms. Emerson retaliated against me in reprisal for engaging in Equal Employment Opportunities activities. On September 29, 2004, the FRB filed a Motion to Dismiss, or in the Alternative, for Summary Judgment. On October 26, 2004, I filed an opposition to the FRB's Motion to Dismiss, or in the Alternative, for Summary Judgment. On June 22, 2005, the district court granted the FRB's Motion to Dismiss, or in the Alternative, for Summary Judgment, and I filed a Motion for Reconsideration and Motion to Alter or Amend on July 8, 2005. The District Court denied my Motion for Reconsideration and Motion to Alter or Amend on August 23, 2005, and so I filed a Notice of Appeal on September 15, 2005. On October 31, 2005, Ms. Emerson and the Board promoted Jill Rosen, a female with less experience, inferior qualifications and less significant achievements than I have, to the officer level position of Assistant Director. I understand that Ms. Emerson has declared that she was not aware of any specific actions taken by me regarding my lawsuit between August and December of 2005, but that would mean that my law suit, and significantly my appeal on September 15, 2005, was not thoroughly discussed "behind closed doors" by all IT officers even though Ms. Emerson told me that this was the normal course of business. Thus based on her own statement I believe Ms. Emerson's claim that she was not aware of any specific actions taken by me regarding my lawsuit between August and December of 2005 is untrue.

Price Declaration at ¶¶ 3-5.

      8.      The Board also argues in its Motion that Ms. Emerson promoted Ms. Rosen because, as attested to in Ms. Emerson's declaration, Ms. Emerson claims that she subjectively believed that Ms. Rosen was the most qualified candidate for the position. Thus the Board asserts that it has provided a legitimate, non-discriminatory for promoting Ms. Rosen instead of Mr. Price, and this forms the basis for its claim that it is entitled to Counts I and II, which assert claims for discrimination under Title VII the ADEA, respectively, as they relate to Ms. Rosen.

4

However, Mr. Price submits that he has superior qualifications and experience to Ms. Rosen and was therefore the best qualified candidate for the position:

> 6. As mentioned above, on October 31, 2005, Ms. Emerson and the Board promoted Jill Rosen, a female with less experience, inferior qualifications and less significant achievements than I have, to the officer level position of Assistant Director. I am more experienced, more qualified and have greater achievements than Ms. Rosen because I have over thirty-five years of technical and managerial experience in the field of Information Technology, as well as a Bachelor or Science, Technology of Management, American University, 1975. I worked for nine years as a Financial/Business software and data base developer including advanced systems analysis and programming in Assembler (IBM), high-level general purpose languages, and data base management systems working for organizations that include the Library of Congress and the Energy Department. I have worked for twenty-six years in the Information Technology Division, Board of Governors. My experience directly relevant to the position awarded to Ms. Rosen includes:
>
> - Eight years as a Senior Communications Analyst/Systems Programmer;
>
> - Two years as Chief of Telecommunications, Information Resource Management, where I Managed three advanced technology teams (local area network, wide-area networks, and electronic mail applications);
>
> - Eight years as a Enterprise Network Manager, where my Management responsibilities included development, implementation, and operation of the Board's network architecture and services;
>
> - Six years managing the Board's Large Systems (mainframe) team; and
>
> - Two years managing the Board's Data Center, IT Help Desk, and Distributed Software Support team.
>
> The forgoing qualifications, experience, and achievements are superior to Ms. Rosen's qualifications, experience, and achievements, and this is clear by comparing them directly with paragraphs nine and ten in Ms. Emerson's declaration filed in support of the Board's Motion for Summary Judgment:

5

> 9. Ms. Rosen's first assignment in the IT Division was as an applications manager in the Statistical Services branch, which included the NIC. As an applications manager, Ms. Rosen was responsible for assisting in the development, maintenance and testing of customized software applications that work specifically with the NIC. The job required Ms. Rosen to have a strong familiarity with the NIC's architecture.
>
> 10. At the time I made my decision to appoint Ms. Rosen to the position of Assistant Director, in October 2005, I knew she had at least nineteen years of experience in the IT field, at least eight of which had been devoted exclusively to database administration in the Board's Management Division. I also knew that Ms. Rosen had a strong understanding of the NIC's existing architecture because she had been successfully working with it since joining the IT Division in July 2000. Given her specialized experience, I believed Ms. Rosen possessed the knowledge, skill and ability to oversee the development and design of customized software applications that could be used in the NARI effort.

Declaration of Marianne Emerson, ¶¶ 9-10, pp. 2-3, Ex. D, Defendants' Motion for Summary Judgment.

> 7. In fact, I was better qualified than Ms. Rosen for the Assistant Director position in question because through my numerous technological assignments I have demonstrated the extraordinary ability to rapidly assimilate complex technical information in all areas of information technology. In addition, during my twenty-six years at the Board I have participated in the implementation of countless client business technical solutions, like ASAP and FIRMA, which is what the Assistant Director position in question is tasked with doing. Moreover, through my experience I have developed a superior knowledge of Board business, applications, and systems, and the extent of my knowledge in these relevant areas is greater than Ms. Rosen's.

Price Declaration at ¶¶ 6-7.

      9.      Accordingly Mr. Price requires Ms. Rosen's qualifications and performance history as well as the written job requirement documentation for the vacancy (including job and candidate requirements). Mr. Price requires this discovery from the Board as it is not available from any other sources, and he requires this information to empirically demonstrate both that he was the more qualified candidate for the position and that Ms. Emerson's subjective reasons, the Agency's allegedly legitimate, non-discriminatory for promoting Ms. Rosen instead of Mr. Price, are in fact untrue.

      10.     Thus Mr. Price requires this discovery in order to prove a requisite element of his case, *i.e.*, pretext, as the Board itself notes in its Motion for Summary Judgment:

> Summary judgment may be granted for the defendant even where plaintiff has established a prima facie case unless the plaintiff "produce[s] substantial probative evidence that the proffered reason was not the true reason for the employment decision and that the real reason was [discriminatory animus]." *Glecklen v. Democratic Congressional Campaign Comm., Inc.*, 199 F.3d 1365, 1367-68 (D.C. Cir. 2000). In other words, <u>"it is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason."</u> *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

Defendant's Motion for Summary Judgment at 5 (emphasis added).

11. The Board also argues in its Motion that Mr. Kim supervised and evaluated both Mr. Price and Mr. Peter Both, but it contends that they are (1) not comparable because not similarly situated and (2) Mr. Kim subjectively was more impressed with Mr. Both and thus rated him higher than Mr. Price. Thus the Board claims that it provided given a legitimate, non-discriminatory for evaluating Mr. Both higher than Mr. Price, and this forms the basis for its claim that it is entitled to Counts I and II, which assert claims for discrimination under Title VII the ADEA, respectively, as they relate to Mr. Both.

12. However, Mr. Price submits that both he and Mr. Both had similar job duties and responsibilities despite their job titles and thus they are similarly situated for comparison purposes:

> 8. Peter Both and I have similar job duties and responsibilities despite our different job titles and thus we are similarly situated for comparison purposes. As a grade 28 manager (at the time of the discrimination), I managed the Mainframe Systems team for six years prior to the IT reorganization in which Mr. Peter Both was selected as a grade 27 manager. There is no distinction in responsibilities or duties between a Unit Manager grade 27 and 28, and it is the same position and the job descriptions are identical. We were also doing comparable work, were evaluated similarly, and we received the same evaluation comments. Both and I managed a similar mix of technical staff consisting of exempt and non-exempt employees, and we were both responsible for advance technology projects of similar complexity. Moreover, Mr. Both and I have the same administrative reporting responsibilities. We were also rated in the same manner, as the Board, and especially the IT division, has a stated goal of a bell-curve performance (PMP) rating distribution. As a result, all employees, regardless of grade,

7

>    compete for the restricted number of PMP ratings of Outstanding and
>    Extraordinary. The goal for the number of outstanding ratings and
>    Extraordinary for each IT branch is approximately 20%, and because of our
>    comparable jobs and comparable responsibilities we are evaluated
>    comparably.

Price Declaration at ¶ 8.

      13.    Accordingly he requires both his and Mr. Both's annual performance reviews and evaluations, written job descriptions, achievements and awards, and Mr. Kim's notes to empirically demonstrate that he and Mr. Both were doing comparable work, were evaluated similarly, and that they received the same evaluation comments but that Mr. Kim rated Mr. Both more highly than Mr. Price even though Mr. Price was more competent and better performing. Mr. Price requires these discovery materials to demonstrate that Mr. Kim's reasons, the Board's allegedly legitimate, non-discriminatory for evaluating Mr. Both superior to Mr. Price, is in fact pretext.

      14.    The Board also argues in its Motion for Summary Judgment that Mr. Fred Vu, a younger, Asian-American colleague of Mr. Price, was one of the individuals selected to receive the Special Achievement Award in question on the basis of certain specific criteria:

> The Board has specific criteria used for nominating and selecting individuals to receive the Special Achievement Award. See Exhibit H, ROI00277-00278, "Special Achievement Awards Program." Candidates are evaluated on one or more of the following stringent standards:
>
> - extraordinary achievements that result in significant cost savings for the Board or the Federal Reserve Banks,
>
> - extraordinary efforts that result in improving or increasing productivity or improving the quality of output,
>
> - extraordinary efforts in management of programs, particularly those that enable the Board to reallocate resources to other high-priority activities,
>
> - extraordinary personal initiative and innovation

- sustained superior performance.

Defendant's Motion for Summary Judgment at 21.

15. As is evidenced in Exhibit H to the Board's Motion for Summary Judgment and p. 21 of Defendant's Motion for Summary Judgment, there is more than one recipient of the Board's Special Achievement Awards in its Special Achievement Awards program. Mr. Price submits that in the time period in question from 2004 to 2005 he met all of the requisite standards to qualify for a Special Award. He had had extraordinary achievements that resulted in significant cost savings for the Board. He had also made extraordinary efforts that resulted in improving and increasing both productivity and improving the quality of output. He had also made extraordinary efforts in management of programs, particularly those that enable the Board to reallocate resources to other high-priority activities. He had also demonstrated extraordinary personal initiative and innovation and had at all times sustained superior performance.

16. The Board submits that Mr. Vu met the criteria above, and it submits the following basis as its legitimate business reason for award the Special Award to Mr. Vu but not to Price:

> Nevertheless, [Mr. Kim] felt that [plaintiff] had not achieved the level of performance required to be nominated for the Board's Special Achievement Award." Id. at ¶ 5. Indeed, Mr. Kim did not nominate any of his subordinates for the award. Id. at ¶ 4.
>
> Moreover, Fred Vu, the IT employee who was nominated and selected for the award certainly met the criteria for it. According to Marianne Emerson, Mr. Vu "had played a key role in establishing disaster-recovery systems for the Board. Fred demonstrated extraordinary personal initiative, creativity and innovation in strengthening the Board's telecommunications infrastructure. He completed an extraordinary project in an extraordinary manner. Emerson Decl., Exh. D, at ¶ 13.

Defendant's Motion for Summary Judgment at 22.

9

17.     Thus the Board claims that it is entitled to Counts I and II, which assert claims for discrimination under Title VII the ADEA, respectively, as they relate to Mr. Vu. However, Mr. Price submits that his achievements were superior to Mr. Vu's achievements:

9. In the time period in question from 2004 to 2005 I met all of the requisite standards to qualify for a Special Award. I had extraordinary achievements that resulted in significant cost savings for the Board. I also made extraordinary efforts that resulted in improving and increasing both productivity and improving the quality of output. I also made extraordinary efforts in management of programs, particularly those that enable the Board to reallocate resources to other high-priority activities. I also demonstrated extraordinary personal initiative and innovation and had at all times sustained superior performance.

10. For example, in January of 2004 a reorganization of the IT division combined into one unit the Mainframe Systems and Distributed Software Support (DSS) units. I was assigned responsibility for the new unit that was previously managed by two managers. Prior to this reorganization, management had considered abolishing the DSS unit. However, within six months I successfully transformed the new unit into a highly motivated and productive technical team. That same year, a second reorganization combined the Data Center/Help Desk with the DSS unit forming the largest unit in IT. At the time I assumed responsibility for the Data Center, the unit had gone without a manager for almost a year. From my years as manager of Mainframe Systems, I had first-hand knowledge of the problems and issues affecting the Data Center. The unit had languished for years. Staff knowledge and technical skills had become obsolete due, in part, to a diminished role of the mainframe. Moreover, staff attendance, behavior, and professionalism had deteriorated to dangerous levels; possibly justifying group adverse action. Working alongside Employee Relations and Legal, I immediately developed a plan to address the most serious problems. Though it was very stressful, tremendous positive change has occurred with all staff accepting greater responsibility for improving their performance.

11. During 2005 I restructured the Data Center operations and DSS into a modern IT Help Desk Service organization. With limited additional resources and using existing staff, I designed and proposed a service organization to IT Senior Management that was approved in January 2005. Since then, I lead the development of a Help Desk Agent training program, implemented a full-function automated Help Desk problem tracking system, a formal process for developing client trouble-shooting escalation procedures, and a web-based Help Desk knowledgebase system. Moreover, I coordinated with all IT infrastructure support units to design and implement, according to best practices, an integrated level 1 and level 2 support processes. I chair a staff

       briefing most mornings to coordinate the numerous Help Desk client support activities.

12. As word spread of the success of the IT Help Desk, the Board's Division of Bank Supervision and Regulation (BS&R) approached me to consider assuming their entire internal help desk client support.  With IT management's guidance, I negotiated and implemented a pilot agreement with BS&R to assume help desk support for their 235 clients.  I coordinated with BS&R to develop a detailed pilot and transition plan. The pilot went into affect on February 1, 2006.  To handle the increase in call volume and to distribute the workload, I developed and implemented formal "stations" each with specific tasks and responsibilities.  In addition, I implemented a shift rotation program (known as the 4th and 5th shifts) that increased the number of first shift Help Desk Agents without increasing staff.

13. The results of the nine-month BS&R pilot were deemed a success by both IT and BS&R senior management.  As a result of this extraordinary success, I am tasked by Mr. Po Kim, Ms. Maureen Hannan, and Ms. Marianne Emerson, to complete a phase II production implementation plan that will expand the pilot services to include all help desk level 1 and desktop level 2 support.  In addition, the Division of Research and Statistics (R&S), the Division of Monetary Affairs (MA), and the Office of the Staff Director for Management (OSDM) – Continuity of Operations (COOP) have expressed serious interest in joining my new Help Desk service organization.  Within the next eighteen to twenty-four months, the Help Desk agents will be thoroughly trained in advanced level 1 desktop support and IT will be in a position to consider expanding the Help Desk service to virtually all Board divisions while expanding the services offerings.

Price Declaration at ¶¶ 9-13.

       18.    Accordingly Mr. Price requires the Board's annual evaluations and performance reviews for both he and Mr. Vu to empirically demonstrate bother that that they were evaluated similarly and also to prove that Mr. Vu was not performing in a more extraordinary manner than was Price.  Moreover, Mr. Price requires Mr. Kim's notes and documentation memorializing Mr. Vu's achievements and awards, as Price requires these discovery materials to demonstrate that Mr. Kim's and Ms. Emerson's reasons, the Agency's allegedly legitimate, non-discriminatory for awarding a Special Award to Mr. Vu but not to Mr. Price, is in fact pretext.

11

I, NICHOLAS WOODFIELD, STATE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

Feb. 2, 2007
Date

Nicholas Woodfield