# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **JOHN A. PRICE,** ) <br> ) <br> **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> **BEN S. BERNANKE, CHAIRMAN,** ) <br> **THE BOARD OF GOVERNORS OF** ) <br> **THE FEDERAL RESERVE SYSTEM,** ) <br> ) <br> **Defendant.** ) <br> ) | **Case No. 06-1569 (RCL)** |

**DECLARATION OF PLAINTIFF JOHN A. PRICE IN SUPPORT OF
PLAINTIFF'S MOTION TO STAY CONSIDERATION OF DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND TO PERMIT DISCOVERY**

I, John A. Price, am over eighteen (18) years of age, am competent to testify, and I make this declaration having personal knowledge of the following facts:

1. I am an employee of the Board of Governors of the Federal Reserve System.

2. I am currently employed as a Data Center and Distributed Software Support Manager, FR-29, at the Board's Information Technology Division, General Systems Support Branch, in Washington, D.C. since 1980.

3. Between January 29, 2004, and March 3, 2004, as a result of the January 29, 2004, reorganization of the Information Technology (IT) Division that resulted in my assuming the full managerial responsibilities of the IT Distributed Software Support (DSS) unit along with my existing managerial responsibilities of the Mainframe Systems Support unit, I specifically informed my direct supervisor, Mr. Po Kim, on several occasions that I was currently engaged in an EEO action against the Board.

4.      Moreover, from 2004 through 2006 I posted a printed copy of a list of legal actions, including and highlighting my federal district court case, on my office bulletin board where it was visible to everyone entering my office.  During this period of time Ms. Marianne Emerson and Mr. Kim had entered my office on numerous occasions.  Also, Mr. Kim and I often conducted meetings in my office.  Thus Mr. Kim's claim that at the time he issued my 2005 PMP on October 24, 2005, that he was unaware of any EEO activity on my part is not accurate.  Moreover, his claim that at the time he made the decision not to nominate me in the fall of 2005 for the Board's Special Achievement Award that he was unaware of any EEO activity on my part or that I had filed a complaint in district court therefore is not accurate.

5.      Ms. Emerson told me on numerous occasions starting in the late 1990s that all personnel actions, adverse actions, reorganizations, promotions, etc., are thoroughly discussed, "behind closed doors" by all IT officers before any decisions are made.  In the months and years after I made my EEO complaints my counsel deposed Ms. Emerson on February 20, 2004.  Four months later, on June 14, 2004, I filed a Complaint in the United States District Court for the District of Columbia alleging that, *inter alia*, Ms. Emerson retaliated against me in reprisal for engaging in Equal Employment Opportunities activities.  On September 29, 2004, the FRB filed a Motion to Dismiss, or in the Alternative, for Summary Judgment.  On October 26, 2004, I filed an opposition to the FRB's Motion to Dismiss, or in the Alternative, for Summary Judgment.  On June 22, 2005, the district court granted the FRB's Motion to Dismiss, or in the Alternative, for Summary Judgment, and I filed a Motion for Reconsideration and Motion to Alter or Amend on July 8, 2005.  The District Court denied my Motion for Reconsideration and Motion to Alter or Amend on August 23, 2005, and so I filed a Notice of Appeal on September 15, 2005.  On October 31, 2005, Ms. Emerson and the Board promoted Jill Rosen, a female with less

experience, inferior qualifications and less significant achievements than I have, to the officer level position of Assistant Director. I understand that Ms. Emerson has declared that she was not aware of any specific actions taken by me regarding my lawsuit between August and December of 2005, but that would mean that my law suit, and significantly my appeal on September 15, 2005, was not thoroughly discussed "behind closed doors" by all IT officers even though Ms. Emerson told me that this was the normal course of business. Thus based on her own statement I believe Ms. Emerson's claim that she was not aware of any specific actions taken by me regarding my lawsuit between August and December of 2005 is untrue.

6.     As mentioned above, on October 31, 2005, Ms. Emerson and the Board promoted Jill Rosen, a female with less experience, inferior qualifications and less significant achievements than I have, to the officer level position of Assistant Director. I am more experienced, more qualified and have greater achievements than Ms. Rosen because I have over thirty-five years of technical and managerial experience in the field of Information Technology, as well as a Bachelor or Science, Technology of Management, American University, 1975. I worked for nine years as a Financial/Business software and data base developer including advanced systems analysis and programming in Assembler (IBM), high-level general purpose languages, and data base management systems working for organizations that include the Library of Congress and the Energy Department. I have worked for twenty-six years in the Information Technology Division, Board of Governors. My experience directly relevant to the position awarded to Ms. Rosen includes:

- Eight years as a Senior Communications Analyst/Systems Programmer;

3

- Two years as Chief of Telecommunications, Information Resource Management, where I Managed three advanced technology teams (local area network, wide-area networks, and electronic mail applications);

- Eight years as a Enterprise Network Manager, where my Management responsibilities included development, implementation, and operation of the Board's network architecture and services;

- Six years managing the Board's Large Systems (mainframe) team; and

- Two years managing the Board's Data Center, IT Help Desk, and Distributed Software Support team.

The forgoing qualifications, experience, and achievements are superior to Ms. Rosen's qualifications, experience, and achievements, and this is clear by comparing them directly with paragraphs nine and ten in Ms. Emerson's declaration filed in support of the Board's Motion for Summary Judgment:

> 9. Ms. Rosen's first assignment in the IT Division was as an applications manager in the Statistical Services branch, which included the NIC. As an applications manager, Ms. Rosen was responsible for assisting in the development, maintenance and testing of customized software applications that work specifically with the NIC. The job required Ms. Rosen to have a strong familiarity with the NIC's architecture.
>
> 10. At the time I made my decision to appoint Ms. Rosen to the position of Assistant Director, in October 2005, I knew she had at least nineteen years of experience in the IT field, at least eight of which had been devoted exclusively to database administration in the Board's Management Division. I also knew that Ms. Rosen had a strong understanding of the NIC's existing architecture because she had been successfully working with it since joining the IT Division in July 2000. Given her specialized experience, I believed Ms. Rosen possessed the knowledge, skill and ability to oversee the development and design of customized software applications that could be used in the NARI effort.

Declaration of Marianne Emerson, ¶¶ 9-10, pp. 2-3, Ex. D, Defendants' Motion for Summary Judgment.

7. In fact, I was better qualified than Ms. Rosen for the Assistant Director position in question because through my numerous technological assignments I have demonstrated the extraordinary ability to rapidly assimilate complex technical information in all areas of information technology. In addition, during my twenty-six years at the Board I have participated in the implementation of countless client business technical solutions, like ASAP and FIRMA, which is what the Assistant Director position in question is tasked with doing. Moreover, through my experience I have developed a superior knowledge of Board business, applications, and systems, and the extent of my knowledge in these relevant areas is greater than Ms. Rosen's.

8. Peter Both and I have similar job duties and responsibilities despite our different job titles and thus we are similarly situated for comparison purposes. As a grade 28 manager (at the time of the discrimination), I managed the Mainframe Systems team for six years prior to the IT reorganization in which Mr. Peter Both was selected as a grade 27 manager. There is no distinction in responsibilities or duties between a Unit Manager grade 27 and 28, and it is the same position and the job descriptions are identical. We were also doing comparable work, were evaluated similarly, and we received the same evaluation comments. Both and I managed a similar mix of technical staff consisting of exempt and non-exempt employees, and we were both responsible for advance technology projects of similar complexity. Moreover, Mr. Both and I have the same administrative reporting responsibilities. We were also rated in the same manner, as the Board, and especially the IT division, has a stated goal of a bell-curve performance (PMP) rating distribution. As a result, all employees, regardless of grade, compete for the restricted number of PMP ratings of Outstanding and Extraordinary. The goal for the number of outstanding ratings and Extraordinary for each IT branch is approximately 20%, and because of our comparable jobs and comparable responsibilities we are evaluated comparably.

5

9. In the time period in question from 2004 to 2005 I met all of the requisite standards to qualify for a Special Award. I had extraordinary achievements that resulted in significant cost savings for the Board. I also made extraordinary efforts that resulted in improving and increasing both productivity and improving the quality of output. I also made extraordinary efforts in management of programs, particularly those that enable the Board to reallocate resources to other high-priority activities. I also demonstrated extraordinary personal initiative and innovation and had at all times sustained superior performance.

10. For example, in January of 2004 a reorganization of the IT division combined into one unit the Mainframe Systems and Distributed Software Support (DSS) units. I was assigned responsibility for the new unit that was previously managed by two managers. Prior to this reorganization, management had considered abolishing the DSS unit. However, within six months I successfully transformed the new unit into a highly motivated and productive technical team. That same year, a second reorganization combined the Data Center/Help Desk with the DSS unit forming the largest unit in IT. At the time I assumed responsibility for the Data Center, the unit had gone without a manager for almost a year. From my years as manager of Mainframe Systems, I had first-hand knowledge of the problems and issues affecting the Data Center. The unit had languished for years. Staff knowledge and technical skills had become obsolete due, in part, to a diminished role of the mainframe. Moreover, staff attendance, behavior, and professionalism had deteriorated to dangerous levels; possibly justifying group adverse action. Working alongside Employee Relations and Legal, I immediately developed a plan to address the most serious problems. Though it was very stressful, tremendous positive change has occurred with all staff accepting greater responsibility for improving their performance.

11. During 2005 I restructured the Data Center operations and DSS into a modern IT Help Desk Service organization. With limited additional resources and using existing staff, I designed and proposed a service organization to IT Senior Management that was approved in January 2005. Since then, I lead the development of a Help Desk Agent training program, implemented a full-function automated Help Desk problem tracking system, a formal process for developing client trouble-shooting escalation procedures, and a web-based Help Desk knowledgebase system. Moreover, I coordinated with all IT infrastructure support units to design and implement, according to best practices, an integrated level 1 and level 2 support processes. I chair a staff briefing most mornings to coordinate the numerous Help Desk client support activities.

12. As word spread of the success of the IT Help Desk, the Board's Division of Bank Supervision and Regulation (BS&R) approached me to consider assuming their entire internal help desk client support. With IT management's guidance, I negotiated and implemented a pilot agreement with BS&R to assume help desk support for their 235 clients. I coordinated with BS&R to develop a detailed pilot and transition plan. The pilot went into affect on February 1, 2006. To handle the increase in call volume and to distribute the workload, I developed and implemented formal "stations" each with specific tasks and responsibilities. In addition, I implemented a shift rotation program (known as the 4th and 5th shifts) that increased the number of first shift Help Desk Agents without increasing staff.

13. The results of the nine-month BS&R pilot were deemed a success by both IT and BS&R senior management. As a result of this extraordinary success, I tasked by Mr. Po Kim, Ms. Maureen Hannan, and Ms. Marianne Emerson, to complete a phase II production implementation plan that will expand the pilot services to include all help desk level 1 and

7

desktop level 2 support. In addition, the Division of Research and Statistics (R&S), the Division of Monetary Affairs (MA), and the Office of the Staff Director for Management (OSDM) – Continuity of Operations (COOP) have expressed serious interest in joining my new Help Desk service organization. Within the next eighteen to twenty-four months, the Help Desk agents will be thoroughly trained in advanced level 1 desktop support and IT will be in a position to consider expanding the Help Desk service to virtually all Board divisions while expanding the services offerings.

**I, NICHOLAS WOODFIELD, STATE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.**

2-2-2007
Date

John A. Price

8